**Jimmy Wayne GAY, Administrator of the Estate of Jason Eric Gay, deceased, Plaintiff,**

v.

**The CITY OF DALEVILLE, et al., Defendants.**

**Civil Action No. 95–D–075–S.**

United States District Court, M.D. Alabama, Southern Division.

July 17, 1996.

Michael D. Ermert, James J. Thompson, Jr., James K. Baker, Birmingham, AL, for plaintiff.

Alex L. Holtsford, Jr., Steven A. Higgins, Montgomery, AL, for defendants.

## MEMORANDUM OPINION

DE MENT, District Judge.

Before the court is defendants City of Daleville, Wess Etheredge, Wayne Hunt, Timothy Hicks and Janet Leyrer's motion for summary judgment filed June 9, 1995. In ruling on said motion, the court has considered the parties' respective briefs, as well as the replies and responses thereto. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motion is due to be granted concerning the § 1983 claims.

## JURISDICTION AND VENUE

The plaintiff alleges that the defendants abridged certain rights guaranteed by the United States Constitution; therefore, jurisdiction is proper under 28 U.S.C. § 1331.[1]

Personal jurisdiction and venue are uncontested.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings,

---

1. Section 1331 provides, "[t]he federal district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331.

depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

## FACTS

On July 29, 1994, Jason Eric Gay committed suicide while incarcerated in the City of Daleville jail. As a result of this suicide, Jimmy Wayne Gay, as administrator of the estate of Jason Eric Gay, deceased, filed this action against the City of Daleville, Alabama; Chief Wess Etheredge; Sergeant Wayne Hunt; Officer Time Hicks and Officer Janet Leyrer. The individual defendants are sued both in their individual and official capacities. The plaintiff's complaint asserts violations of the Fourth, Fifth and Fourteenth Amendments as remedied by 42 U.S.C. § 1983, as well as a state law claim for wrongful death based upon allegations of negligent hiring, training and supervision. An answer was filed by the defendants denying any liability and asserting numerous defenses, including qualified immunity.

On July 29, 1994, at approximately 3:01 a.m., a vehicle driven by Jason Eric Gay ("Mr. Gay") was stopped by Officer Tim Hicks of the City of Daleville Police Department. Officer Hicks had clocked Mr. Gay with his radar traveling fifty-one miles per hour in a thirty-five mile per hour zone. Also participating in this traffic stop were Sergeant Wayne Hunt of the City of Daleville Police Department; Reserve Officer Kevin Souders of the City of Daleville Police Department; and Officer Spencer Clark of the City of Level Plains Police Department. Robert Sowell was a passenger in the vehicle driven by Mr. Gay.

Following the initial stop, Officer Hicks detected the "strong odor" of alcohol on Mr. Gay. Thereafter, field sobriety tests were administered to Mr. Gay by Officer Hicks. As a result of Mr. Gay's failure of the field sobriety test, he was placed under arrest by Officer Hicks for driving under the influence of alcohol. According to Officer Hicks, Mr. Gay did not resist and there was nothing out of the ordinary about this arrest. Officer Hicks transported Mr. Gay to the City of Daleville Police Department in the rear of his patrol car. Although Mr. Sowell was not placed under arrest, he was also transported to the City of Daleville Police Department because he had also been drinking.

On the way to the police station, Officer Hicks radioed Officer Janet Leyrer and advised her that he was bringing Mr. Gay to the police station. Officer Leyrer was working as a dispatcher with the City of Daleville Police Department the morning of July 29, 1994.

The City of Daleville has a video monitoring system that allows the videotaping of the booking process.[2] It is the policy of the City

---

**2.** The City of Daleville video system consists of multiple cameras which depict various areas of the police station. In regard to the taping of prisoners such as Mr. Gay, there is a camera that shows the outside bay were prisoners are brought into the station. In addition, there is a camera which depicts the booking room. This camera also shows the intoxilyzer machine and is used to tape the testing process. Finally, on July 29, 1994, there was a camera in the cell

of Daleville that booking procedures for driving under the influence of alcohol arrests are videotaped for evidentiary purposes. Officer Leyrer turned on the videotaping system upon Officer Hicks' arrival at the police station. City of Daleville records reflect that Officer Hicks and Mr. Gay arrived and the police station at approximately 3:18 a.m.

Upon arriving at the station, Mr. Gay was brought into the booking room adjacent to the four jail cells in the City of Daleville jail. Mr. Gay was seated next to a table in the booking room while Officer Hicks began preparing the arrest report and other paperwork. According to Officer Hicks, there was really nothing out of the ordinary with Mr. Gay's behavior at this time. Although he later became nervous when requested to take the intoxilyzer test, he was not visibly upset at this time and, according to Officer Hicks, was "nice."

Because Officer Hicks was not certified to administer the intoxilyzer test, the test was administered by Sergeant Hunt. The intoxilyzer test was administered to Mr. Gay at approximately 3:41 a.m. The result of the intoxilyzer test on Mr. Gay was .143, which is above the then legal limit in Alabama of .10.

It was during this period of time that Mr. Gay became visibly upset. Although Mr. Gay never physically resisted the police officers once he was informed he was going to be placed in jail, Officer Hicks heard Mr. Gay stating that he would commit suicide if he was placed in jail.

Subsequently, Mr. Gay was allowed to make a telephone call to his brother, Jimmy Wayne Gay ("plaintiff"). Sergeant Hunt and Officer Hicks could not hear any of the contents of this phone conversation. However, both officers could hear Mr. Gay sniffling and whimpering. This phone conversation took between five and ten minutes.

After Mr. Gay was asked to end the phone conversation, Officer Hicks spoke with Mr. Gay's brother. Mr. Gay's brother advised Officer Hicks that Mr. Gay was suicidal and that he had tried suicide in the past. Officer Hicks informed Mr. Gay's brother that he would take precautions and gave Mr. Gay's brother directions to the police station. Officer Hicks testified that he took this phone call seriously.

While Officer Hicks was on the phone, Sergeant Hunt placed Mr. Gay in a jail cell with another inmate, Robert Martin. As Sergeant Hunt returned to the booking room, he was advised by Officer Hicks of the contents of his phone conversation with Mr. Gay's brother. Officer Hicks asked Sergeant Hunt whether they should restrain Mr. Gay. Sergeant Hunt replied no.

In light of Mr. Gay's behavior and the information from Mr. Gay's brother, multiple actions were taken by the officers. First, as noted above, Mr. Gay was placed in a cell with another inmate. However, the other inmate remained asleep throughout Mr. Gay's suicide. Second, Sergeant Hunt informed Officer Leyrer, the dispatcher, that they had a potentially suicidal inmate in the jail and that she should monitor the cell block area with the video system.[3] Officer Leyrer turned up the volume on the audio monitoring system.[4] In addition, various articles of clothing and jewelry were removed from Mr. Gay before he was placed in the cell. The

block area which showed portions of the four cells. The video cameras are monitored by two black-and-white monitors in the dispatcher's office.

A video cassette recorder located in the dispatcher's office was used to tape booking procedures. Due to a mechanical problem with the video cassette recorder, the tape recorded by Officer Leyrer of Mr. Gay's booking was "blank" when viewed the morning of the suicide.

3. As noted above, the City of Daleville has a video monitoring system with multiple cameras. The monitors for the cameras typically scroll through the various cameras so that all areas can be monitored. Once Office Leyrer was advised that she should monitor the cell area, she locked the camera that was located in the cell area so that she could observe the cell block area. The camera in place at the time of the suicide depicted the doors of the cells in the cell block. Portions of the jail cells were not visible form the video camera located in the cell block area.

4. The City of Daleville also utilizes an audio monitoring system in its jail area. This system consists of a microphone in the cell block area which can be used to monitor sound. Officer Leyrer testified that she turned the volume on this system up higher than normal so that she could more closely monitor the cell block area.

officers removed Mr. Gay's belt as well as several strings of beads that he was wearing. Mr. Gay also was not given bed linens by the officers. Finally, Mr. Gay was searched carefully to determine whether he had retained any personal property which could be used to injure himself.

In addition, in light of Mr. Gay's statements and the statements of Mr. Gay's brother, Officer Hicks elected to remain in the booking area rather than returning to patrol. In these early morning hours, Sergeant Hunt and Officer Hicks were the only two police officers on duty with patrol responsibilities. In light of these circumstances, Officer Hicks stayed in the booking room at a table completing his paperwork. Although the cell in which Mr. Gay was placed was not visible to Officer Hicks, he was seated at a table that was approximately eight to ten feet away from the cell.

At approximately 4:05 a.m., Sergeant Hunt left the City of Daleville Police Department to go get something to eat. At approximately 4:28 a.m., Mr. Gay was discovered with one of his pant legs tied around his neck. The pants were tied to the cell door. Subsequently, Officer Hicks and Officer Leyrer radioed for help and began resuscitation efforts. However, their efforts and additional medical efforts were unsuccessful, and Mr. Gay was subsequently pronounced dead at the Lister Army Hospital.

## DISCUSSION

### A. Section 1983 Claims

#### 1. Individual Defendants

##### a. Official Capacities

■ It is well established that "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams,* 862 F.2d 1471, 1476 n. 4 (11th Cir.1989); *see also Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978) (indicating that "official-capacity suits generally represent only another way of pleading action against an entity of which an officer is an agent"); *Welch v. Laney,* 57 F.3d 1004,

1007 (11th Cir.1995); *Farred v. Hicks,* 915 F.2d 1530, 1532 (11th Cir.1990). The Supreme Court of the United States has expressly extended this principle to municipalities and their officers, noting that "there is no longer a need to bring official capacity suits against local government officials [since] local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). Thus, the plaintiff's § 1983 claims against the officers in their official capacities are simply a reconstitution of his claims against the City of Daleville. Given that the plaintiff has named the City of Daleville as a defendant in this action and has raised § 1983 claims against it, his claims for § 1983 relief as to the individual defendants in their official capacities are redundant. Therefore, the individual defendants' motion for summary judgment against them in their official capacities is due to be granted.

#### b. Individual Capacities

Chief Etheredge, Sergeant Hunt, Officer Hicks and Officer Leyrer also argue that even if evidence exists which supports a constitutional violation, they are still entitled to qualified immunity, which extinguishes liability for any and all claims against them in their individual capacity. The plaintiff can avoid summary judgment on the qualified immunity issue by demonstrating either that the defendants are not entitled to immunity as a matter of law or that there exists a genuine issue of material fact as to this question of law. *Rich v. Dollar,* 841 F.2d 1558 (11th Cir.1988).

■ A § 1983 litigant must overcome the onerous burden of defeating the qualified immunity defense in order to recover monetary damages from the pocket of a government official. The basis of the qualified immunity defense is firmly established:

> When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. If sued "individually," a munici-

pal officer may raise an affirmative defense of good faith, or "qualified," immunity. *Swint v. City of Wadley,* 51 F.3d 988, 994 (11th Cir.1995) (quoting *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)). In fact, based upon the case law in this circuit, perhaps a more appropriate name for this defense would be "unqualified immunity." The issue of whether the defendants are entitled to qualified immunity may be properly determined on a pretrial motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure.*

■■■ For the plaintiff to defeat the defendants' motion for summary judgment based on qualified immunity, he must show that the defendants are not entitled to qualified immunity as a matter of law or that genuine issues of material fact exist so that the determination of whether the defendants are entitled to qualified immunity are only properly determined after findings of fact have been made by the jury. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). However, even disputes over genuine issues of material fact will not "preclude summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions." *Id.* at 1564.

The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Rich,* 841 F.2d at 1563 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *see* also *Ansley v. Heinrich,* 925 F.2d 1339, 1348 (11th Cir.1991). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■■■ The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis, which the court will refer to as the *Zeigler* paradigm or test. A government official first must demonstrate that " 'he [or she] was acting within the scope of his [or her] discretionary authority when the ˙ allegedly wrongful acts occurred.' " *Rich,* 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). "Once the defendant public official satisfies his [or her] burden of moving forward with the ·evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.' " *Rich,* 841 F.2d at 1563–64 (quoting *Zeigler,* 716 F.2d at 849).

■■■ Whether applicable law was clearly established at the time of the challenged action is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and the Supreme Court of Alabama. *D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995); *Courson v. McMillian,* 939 F.2d 1479, 1498 & n. 32 (11th Cir.1991). The relevant inquiry must be "fact specific," *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994) (De Ment, J.),[5] and the plaintiff must point to a controlling case, decided

---

**5.** In *Rodgers,* the Eleventh Circuit reversed this court's order denying the defendants' qualified immunity on a motion for summary judgment. The Eleventh Circuit's inquiry in that case demonstrates the factual depth required for determining whether the law was clearly established:

The question in this case is not whether, in general, involuntarily committed patients have a legally cognizable interest under the Fourteenth Amendment to safe conditions. They do. Instead, the question in this case, as in all qualified immunity cases, is fact specific: in May 1991, was it clearly established in this circuit that it was unconstitutional for a mental institution to fail to supervise a patient for fifteen minutes in the smoking room when she was on close watch status for a health problem, when the institution had a history of some "sexual contact" involving patients other than plaintiff but no history of rape for the past twelve years, where a previous patient who was to be similarly monitored disappeared, apparently escaped through a bathroom window, and fell to her death on a ledge below, and where the plaintiff had never before complained of unwanted sexual contact from either the patient accused, any other patient, or any member of the staff? The answer is "NO."

39 F.3d at 311.

before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994). As emphasized in *Lassiter,* "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violated federal law *in the circumstances.*" *Lassiter,* 28 F.3d at 1150 (emphasis in original); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right"). In other words, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Rodgers,* 39 F.3d at 311 (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994)). The plaintiff cannot rely on "general conclusory allegations" or "broad legal truisms." *City of Fort Lauderdale,* 7 F.3d at 1557 (quoting *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)); *see also Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1574–75 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993); *Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987).

The evidence is undisputed that the officers were performing discretionary functions. Therefore, the court finds that the defendants have met their burden of proving that each of them was acting within his or her official capacity during the conduct in question. The first step of the *Zeigler* paradigm having been completed, the burden of proof now shifts to the plaintiff.

 As to the second prong of the *Zeigler* test, i.e., that the defendants' conduct violated a clearly established constitutional law, the Eleventh Circuit has a clearly articulable standard which a plaintiff is required to meet in order to avoid summary judgment in

a jail suicide context. As stated in *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989):

> In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed "deliberate indifference" to the prisoner's taking of his own life. In addition, once the defense of qualified immunity is raised, the plaintiff must persuade the court that the law was clearly established and that the defendant's conduct in the circumstances amounted to "deliberate indifference."

*Id.* at 1274–75 (citations omitted). The court will address the foregoing legal standards separately to the actions of Officer Hicks, Sergeant Hunt, Officer Leyrer and Chief Etheredge.

#### i. Officer Hicks, Sergeant Hunt and Officer Leyrer

Officer Hicks—Following the administration of the intoxilyzer test by Sergeant Hunt, Mr. Gay advised Officer Hicks that "he could not go to jail, that he would commit suicide if placed in a jail cell." Exh. D, Depo. of Hicks at 53–54. Subsequently, Officer Hicks spoke with Mr. Gay's brother who informed him that Mr. Gay was "suicidal" and that Mr. Gay had "tried it in the past." *Id.* at 64. At that time, other than his verbal statements, Mr. Gay had not physically manifested any intent to harm himself. In fact, Mr. Gay had been cooperative with the officers and did not resist in any way. However, in light of Mr. Gay's statements and the phone conversation with Mr. Gay's brother, Officer Hicks took Mr. Gay's potential suicide risk seriously. *Id.* at 65. Accordingly, Officer Hicks, along with Sergeant Hunt and Officer Leyrer, took numerous steps to assure the safety of Mr. Gay. These steps included the following:

1. Informing his superior officer, Sergeant Hunt, that Mr. Gay was suicidal and had tried suicide in the past. *Id.* at 65.

2. Asking his superior officer, Sergeant Hunt, whether they should "tie [Mr. Gay] down or restrain him." *Id.* at 65–66.

3. Removing Mr. Gay's cloth belt and beaded necklaces. *Id.* at 63.

4. Placing Mr. Gay in a cell with another inmate. *Id.* at 68.

5. Conducting multiple searches of Mr. Gay to insure that he had nothing with which he could injure himself. *Id.* at 69.

6. Mr. Gay was not given bed linens. *Id.* at 97.

7. Officer Hicks, rather than going back out on patrol, remained in the booking area completing paperwork. Although Mr. Gay's cell was not visible from the table where Officer Hicks was seated, Officer Hicks testified that he was approximately eight to ten feet away from the cell. *Id.* at 84–85.

In addition to the steps described above, Sergeant Hunt advised Officer Leyrer that she should turn up the volume on the audio monitoring system and lock in the video camera located in the cell block to monitor the jail area. Exh. C, Depo. of Hunt, at 75–76; Exh. E, Depo. of Leyrer at 50, 56 & 59. Officer Leyrer complied with this request. Although the exact time of the suicide is unclear, the undisputed evidence indicates that no more than 30 minutes passed from the time Sergeant Hunt placed Mr. Gay in the cell until he was discovered by Officer Hicks and Dewey Jackson, a trusty at the Daleville City Jail.

Sergeant Hunt—Sergeant Hunt was the senior officer on duty the morning of Mr. Gay's suicide. Sergeant Hunt was present at the scene of the traffic stop and administered the intoxilyzer test to Mr. Gay at the police station. Exh. C, Depo. of Hunt at 52. The result of the test placed Mr. Gay's blood alcohol level at .143. *Id.* at 54. During this time, according to Sergeant Hunt, Mr. Gay was not "emotional or violent." *Id.* at 64.

Following the intoxilyzer test, Mr. Gay made a telephone call to his brother. *Id.* at 65. Although Sergeant Hunt observed Mr. Gay during the phone conversation, he could not hear any of what was said. *Id.* at 68. However, Sergeant Hunt testified that he could hear Mr. Gay "whimper" and "mumble." *Id.* After Mr. Gay got off the phone, Officer Hicks spoke with Mr. Gay's brother. At that time, Sergeant Hunt and Reserve Officer Souders placed Mr. Gay in a cell with another inmate. *Id.* at 69 & 74. Although

Sergeant Hunt did not hear Mr. Gay make any statements regarding suicide, Sergeant Hunt testified that Mr. Gay said "[i]f you put me in here [the cell], you might as well notify the state institution." *Id.* As Sergeant Hunt walked away from the cell Mr. Gay was in, he heard a "slap" on the wall of the cell. Sergeant Hunt told Mr. Gay that he understood Mr. Gay was having "some problems" and advised him to "lay down and go to sleep." *Id.* at 72.

As Sergeant Hunt came back into the booking room, he was advised by Officer Hicks that Mr. Gay's brother had told him that Mr. Gay was suicidal and had tried suicide in the past. *Id.* at 75–76. Sergeant Hunt responded in the negative to Officer Hick's inquiry regarding restraining Mr. Gay. *Id.* at 77. In light of the information from Officer Hicks, Sergeant Hunt instructed Officer Leyrer in dispatch that she should watch her video monitor of the cell area closely and turn up the volume on the audio system. *Id.* at 76, 92. Also, Mr. Gay was not given bed linens. *Id.* at 82. In addition, Mr. Gay was searched and several strands of beads were taken away from him. *Id.* at 82–83. Finally, Sergeant Hunt testified that Officer Hicks remained in the booking area following Mr. Gay being placed in the cell. *Id.* at 83.

Sergeant Hunt left the station with Reserve Officer Souders after Mr. Gay was placed in the cell around 4:00 a.m. Sergeant Hunt and Reserve Officer Souders were at a local restaurant when they were called by Officer Leyrer over the radio. Sergeant Hunt estimated that the suicide occurred between 4:05 a.m. and 4:30 a.m. *Id.* After receiving the radio call, Sergeant Hunt and Reserve Officer Souders returned to the police station and began assisting in medical efforts to revive Mr. Gay.

Officer Leyrer—Officer Leyrer was the dispatcher on duty the morning of July 29, 1994. Officer Leyrer testified that police activity was "pretty light" the morning of Mr. Gay's arrest. Exh. E, Depo. of Leyrer at 25 & 39. According to the "case card" prepared by Officer Leyrer, the traffic stop involving Mr. Gay occurred at 3:01 a.m. *Id.*

at 19. Officer Hicks arrived at the police station with Mr. Gay at 3:18 a.m. Once Officer Hicks arrived at the police station, Officer Leyrer activated the videocassette recorder. *Id.* at 28–29. The videocassette recorder was turned off when Sergeant Hunt left the police station at approximately 4:05 a.m.[6] *Id.* at 30.

While Mr. Gay was in the booking area, Officer Leyrer observed him on the video monitor. *Id.* at 35 & 39. Officer Leyrer did not observe anything unusual about Mr. Gay's behavior during this time. *Id.* at 41–42. Also, Officer Leyrer did not see Mr. Gay become visibly upset or cry while Mr. Gay was in the booking room. *Id.* at 42. She could not hear any of the conversation in the booking area. *Id.* at 44. Subsequently, Officer Leyrer observed Sergeant Hunt placing Mr. Gay in the jail cell. *Id.* at 46. Once Mr. Gay was placed in the cell, Officer Leyrer switched one of her video monitors to the camera in the jail area. Officer Leyrer testified that this camera allowed her to see "the jail doors." *Id.* at 47.

At some point, Sergeant Hunt advised Officer Leyrer that Mr. Gay might be a suicide risk. *Id.* at 48. Officer Leyrer testified that she took this information "seriously." *Id.* at 59. In light of this information, Officer Leyrer told Sergeant Hunt "to go back and make sure [Mr. Gay didn't] have anything on him, check [Mr. Gay's] shoes and make sure there's no buckles on them so [Mr. Gay] couldn't cut himself." *Id.* at 49. In addition, Officer Leyrer "turned [her] volume up even higher and watched closer at the monitor." *Id.* at 50, 56 & 59.

Afterwards, Sergeant Hunt and Reserve Officer Souders left the police station. *Id.* at 52. Officer Hicks remained in the booking area doing paperwork. *Id.* During this time, Officer Leyrer was working on "nothing specific" and was regularly checking the video monitors. *Id.* at 72. The door between the booking area and the jail cells was open. *Id.* at 59. The only sounds Officer Leyrer could hear coming from the jail area were "shuffling" sounds. *Id.* at 60. Officer

Leyrer continued to watch the monitor showing the jail area on a regular basis; however, she did not see Mr. Gay wrap his pants around the bars on the cell door. *Id.* at 62.

Shortly after Sergeant Hicks and Reserve Officer Souders left the station, Officer Hicks requested Officer Leyrer's assistance with Mr. Gay. Officer Hicks then radioed for Sergeant Hunt to return to the station. It was not until she viewed her monitor after assisting with the medical efforts that she noticed the pants tied to the cell door. *Id.* at 64.

Although it appears to the court that Mr. Gay's statements and the statements of Mr. Gay's brother to Officer Hicks were sufficient to place the defendants on notice of the potential for suicide, it is undisputed that Officer Hicks heard these statements and took them seriously enough not to return to patrol. In addition, this information was relayed to Sergeant Hunt and Officer Leyrer and multiple precautions were taken. Although Mr. Gay had not demonstrated any physical actions which indicated that he may attempt to harm himself, Officer Hicks, Sergeant Hunt and Officer Leyrer took the threat seriously and took the numerous precautions.

In *Belcher v. City of Foley,* 30 F.3d 1390 (11th Cir.1994), the most recent decision in this circuit dealing with jail suicides, Rocky Belcher was arrested at his home when, drunk and belligerent, he threatened to kill himself and his grandmother. Two hours later, he was dead, by suicide, in the City of Foley police station. In the interim, jailers had twice stopped him as he was attempting suicide. One of these attempts involved an effort by Mr. Belcher to hang himself. Subsequently, Mr. Belcher was transferred to a bare cell; one with no toilet and no bed. In addition, his shirt was taken from him.

A recommendation that Mr. Belcher be charged with disorderly conduct so that he could be transferred to the county jail, which was equipped to deal with suicidal inmates, was not implemented in time. A further

---

6. Later that morning, either Chief Etheredge or Investigator Bullard requested the tape from Officer Leyrer. Exh. B, Depo. of Etheredge at 25.

When Chief Etheredge viewed the tape, it was "blank" due to a malfunction of the videocassette recorder. *Id.* at 25–26.

recommendation that, until his transfer, he be constantly monitored was also ignored, although Mr. Belcher was probably not left alone for more than five consecutive minutes. Thereafter, Mr. Belcher was discovered with the elastic from his underwear wrapped around his neck and tied to the lower bar of the jail-cell door.

The plaintiff filed suit against the City, police chief and various officers. The individual defendants sought summary judgment on the claims against them in their individual capacities, on the ground of qualified immunity. The trial court denied the motions. Subsequently, the Eleventh Circuit reversed the district court's denial of summary judgment on the ground of qualified immunity:

> After reviewing the case law at the time of Mr. Belcher's death, we conclude that it did not clearly establish that measures materially similar to those taken by Corporal McKinley, Officer Roberson, and Officer Riebeling, to prevent Mr. Belcher from committing suicide, were so inadequate as to constitute deliberate indifference.

30 F.3d at 1401. Likewise, in *Popham v. City of Talladega*, 908 F.2d 1561 (11th Cir. 1990), the court noted that:

> A prison custodian is not the guarantor of a prisoner's safety.... The standard procedures followed by Popham's custodians, *i.e.*, removal of shoelaces, belts, socks, and pocket contents demonstrate an effort to assure his safety and a lack of deliberate indifference. Closed circuit cell monitoring is further reflective of a custodial concern for his welfare ... The fact that the camera did not pick up every corner of the cell might be evidence of negligence, but could hardly demonstrate deliberate indifference.

*Id.* at 1564 (citation omitted).

When the steps taken by Sergeant Hunt, Officer Hicks and Officer Leyrer—video and audio surveillance, removal of various articles of clothing and jewelry, denial of bed linens to Mr. Gay, placement of Mr. Gay in a cell with another prisoner, multiple searches of Mr. Gay and Officer Hicks remaining in the booking area rather than returning to patrol—are compared with those in *Belcher* and *Popham*, it is clear, in light of the above-cited standards regarding qualified immunity, that no clearly established law mandates that additional action be taken. In fact, the court finds that the actions taken by the defendants in this case are inconsistent with deliberate indifference; rather these actions reflect a custodial concern for Mr. Gay's welfare.

The plaintiff also contends that the actions taken in this case were constitutionally deficient because Mr. Gay was not constantly observed after being placed in a cell. However, there is no requirement in the Eleventh Circuit that prisoners must be seen by jailers at all times. In *Popham*, the court stated:

> Plaintiff complains of the fact that there were no guards on duty for the last shift and the failure of the camera to cover the small area of the cell in which the decedent committed suicide, but cites no cases for the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times.

908 F.2d at 1565. As the *Belcher* court stated, "*Popham* therefore rejected any argument that failing to guard an inmate continuously constituted deliberate indifference." 30 F.3d at 1400. Here, as previously mentioned, the facts reveal that an officer was seated approximately eight to ten feet away from Mr. Gay's cell, Mr. Gay was in a cell with another inmate, a portion of the cell was monitored with a video and an audio monitoring device and the suicide occurred relatively shortly after Mr. Gay was placed in the cell.

Based on the foregoing discussion and after exhaustively researching the issue, the court simply has been unable to find any controlling cases with facts similar to those in the instant action which find constitutional violations. As such, because neither the Eleventh Circuit, the Supreme Court of the United States, nor the Supreme Court of Alabama has considered facts and circumstances which are *closely* analogous to those in the case at bar as constituting a constitutional violation, the court finds that it is not clearly established that Sergeant Hunt, Officer Hicks or Officer Leyrer's actions constituted Fourth, Fifth or Fourteenth

Amendment violations on July 29, 1994. Accordingly, the court finds that Sergeant Hunt, Officer Hicks and Officer Leyrer are entitled to qualified immunity as to the § 1983 claims asserted against them in their individual capacities.

### ii. Chief Wess Etheredge

Chief Wess Etheredge has been the Public Safety Director for the City of Daleville since 1986. Exh. B, Depo. of Etheredge at 10. Chief Etheredge played no role in the arrest of Mr. Gay and was not present in the jail at the time of his death. In fact, he was off-duty and was notified at home after the suicide. *Id.* at 19. Furthermore, Chief Etheredge never had any contact or conversations with Mr. Gay or any of his family members prior to Mr. Gay's death. *Id.* at 20.

The plaintiff seeks to hold Chief Etheredge liable for failing to hire capable personnel to perform law enforcement duties; failure to adequately train such persons in the performance of duties; and failure to provide adequate supervision of such persons. In addition, the plaintiff also asserts that Chief Etheredge failed to develop, implement and administer procedures or policies designed to guard against jail suicides.

■ "Supervisory officials are not liable under § 1983 on the basis of respondeat superior or vicarious liability." *Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir.1992). They may, however, be liable under § 1983 "when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991); *see also Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir.1990).

#### 1. Failure to Hire Capable Law Enforcement Personnel

■ In order to qualify for employment as a police officer with the City of Daleville, an applicant must be a high school graduate or have received a GED. Exh. B, Depo. of Etheredge at 11. In addition, applicants must comply with the minimum standards for law enforcement officers established by the State of Alabama. *Id.;* Ala.Code § 36–21–46 (minimum standards for applicants and appointees for employment as law enforcement officers). This includes attendance and graduation from a state-approved police academy. *Id.* at 12.

Both Sergeant Hunt and Officer Hicks were graduates of certified police academies at the time of Mr. Gay's suicide. Exh. C, Depo. of Hunt at 11; Exh. D, Depo. of Hicks at 15. In addition, both officers had received additional law enforcement training during the course of their employment with the City of Daleville. Exh. C, Depo. of Hunt at 15–22; Exh. D, Depo. of Hicks at 14–20. In addition, both Sergeant Hunt and Officer Hicks had prior law enforcement experience prior to Mr. Gay's suicide.

Similarly, Officer Leyrer, a dispatcher, had received training in communications prior to the suicide. Exh. E, Depo. of Leyrer at 9–12. In fact, she was certified in Basic Telecommunicator Training as sponsored by the Associated Public Safety Communications Officers Institute. *Id.* She had also received training from her supervisor, Judy Quinn, on how to monitor suicide risks in the jail. *Id.* at 11–12.

Based on the foregoing facts, the court finds that the hiring of Sergeant Hunt and Officer Hicks in this case complied with City of Daleville policy and with the Ala. Code, § 36–21–46. In addition, the court finds that Officer Leyrer was fully trained in communications and monitoring suicide risks in the jail. Because there is no clearly established law that any additional qualifications were required for the positions held by Sergeant Hunt, Officer Hicks and Officer Leyrer, the court concludes that there is no deliberate indifference. Consequently, Chief Etheredge is entitled to qualified immunity on this claim.

#### 2. Failure to Adequately Train Law Enforcement Personnel

■ A supervisory official is not liable under § 1983 for an injury resulting from his failure to train subordinates unless his "failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact" and the failure has actually caused the injury to which

the plaintiff complains. *Popham v. City of Talladega*, 908 F.2d 1561, 1564–65 (11th Cir. 1990). Only when the failure to train amounts to "deliberate indifference" can it properly be characterized as a "policy" or "custom" that is necessary for § 1983 liability to attach. *City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205. Failure to train can amount to deliberate indifference when the need for more or different training is obvious based on prior experience and when the failure to train is likely to result in the violation of a constitutional right. *Id.* at 390, 109 S.Ct. at 1205–06.

In *Belcher, supra,* the police chief had knowledge of a prior suicide at the Foley jail. Further, the chief had received recommendations from the city's insurer regarding suggested changes in the city jail to prevent suicides. The plaintiff contended that these two matters placed the chief on notice of the need to train his officers in the handling of suicidal inmates. The plaintiff in *Belcher* asserted that *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990), clearly established that a reasonable supervisory official who knows of a previous suicide in his facility, but who fails to train his subordinates in the proper handling of suicidal inmates, acts with deliberate indifference.

Distinguishing *Greason* from the facts of *Belcher*, the court in *Belcher* rejected this argument, holding that the plaintiff's contention required too much of an "inductive leap" to defeat the chief's qualified immunity. The court further stated:

[The plaintiff] cites no decision other than *Greason* to clearly establish that Chief Anderson's failure to train his officers amounted to deliberate indifference, and we find none that do. Therefore, we conclude that, at the time of Mr. Belcher's death, the law was not clearly established that Chief Anderson's failure to train his officers in the handling of suicidal inmates amounted to deliberate indifference to Mr. Belcher's constitutional rights.

30 F.3d at 1398.

Here, although Chief Etheredge testified that there had been three or four suicide attempts, at most, in the City of Daleville jail since the mid 1960s, there had been no suc-cessful suicides. Exh. B, Depo. of Etheredge at 16 & 19. Thus, the notice of a prior successful suicide present in *Belcher* is absent in this case. In light of the *Belcher* decision, the court finds that there is no authority for the plaintiff's position that Chief Etheredge's alleged failure to train his officers amounted to deliberate indifference. Correspondingly, it cannot be said that, at the time of Mr. Gay's death, there was any clearly established law that Chief Etheredge's failure to train his officers in the handling of suicidal inmates amounted to deliberate indifference. Accordingly, the court finds that Chief Etheredge is entitled to qualified immunity on this claim.

### 3. Failure to Adequately Supervise Law Enforcement Personnel

■ As noted above, Chief Etheredge is the Public Safety Director for the City of Daleville. Chief Etheredge was off-duty and was not notified about the incident until after Mr. Gay's suicide. At the time of Mr. Gay's death, in the early morning hours of July 29, 1994, Sergeant Hunt, Officer Hicks and Officer Leyrer were the only police officers on duty. Sergeant Hunt was the senior officer on duty and was advised of the potential suicide of Mr. Gay by Officer Hicks. In turn, Sergeant Hunt advised Officer Leyrer of this possibility. Thus, all officers on duty at the time of Mr. Gay's death were on notice of the potential suicide and took multiple precautions consistent with the City's unwritten policy concerning potentially suicidal inmates.

Further, it is undisputed that Sergeant Hunt, Officer Hicks and Officer Leyrer were all informed and conscious of the City's unwritten policy regarding the handling of suicidal inmates at the time of Mr. Gay's suicide. Further, it is undisputed that the officers took the information concerning Mr. Gay's potential suicide seriously and took numerous precautions in line with the City's unwritten policy.

In light of the foregoing, it is clear to the court that the City of Daleville and Chief Etheredge, although he was not present in the jail at the time of the suicide, had in place an unwritten policy concerning suicidal

inmates. Further, the officers on duty were all knowledgeable of the policy and acted accordingly. As a result, the court finds that the actions of Chief Etheredge can not amount to deliberate indifference. There are no cases which stand for the proposition that a police chief is responsible for personally supervising every decision that is made by his officers. Further, in light of the clearly established case law in place at the time of Mr. Gay's death, there is no basis to argue that Chief Etheredge had any supervisory responsibilities greater then those exercised in this case. Accordingly, the court finds that Chief Etheredge is entitled to qualified immunity on the plaintiff's claim based on the allegedly inadequate supervision of Sergeant Hunt, Officer Hicks and Officer Leyrer.

### 4. Failure to Provide Adequate Policy Regarding Potentially Suicidal Prisoners

■ Although the City of Daleville has no written policy regarding the handling of potentially suicidal prisoners, the evidence reveals that there are unwritten policies that are taught to the officers. For example, officers are instructed to inform the dispatcher if there is a potentially suicidal prisoner in the jail. Exh. C, Depo. of Hunt at 24; Exh. D, Depo. of Hicks at 21. In light of such information, dispatchers have been instructed to turn up the volume on the audio monitoring system and view the video monitor more closely. Exh. E, Depo. of Leyrer at 12. Officers are also instructed to deny bed linens to potentially suicidal prisoners and any dangerous or loose clothing, such as belts, shoelaces or necklaces, are removed from the prisoner. Exh. C., Depo. of Hunt at 23; Exh. D, Depo. of Leyrer at 13.

In *Schmelz v. Monroe County*, 954 F.2d 1540, 1544 (11th Cir.1992), the Eleventh Circuit held that a sheriff who had an unwritten policy that "made an effort to identify and protect potentially suicidal inmates form self-harm" was not guilty of deliberate indifference. Chief Etheredge asserts that his un-

written policy, discussed above, for the handling of potentially suicidal inmates meets the *Schmelz* standard. The court can find no controlling case law requiring any more in the way of a policy. In fact, *Belcher* held that it was not "clearly established at the time of Mr. Belcher's death [in August 1991] that a police chief's failure to have a written policy for the handling of suicidal inmates constituted deliberate indifference." Because at the time of Mr. Gay's death no decision had clearly established that Chief Etheredge's actions and inactions constituted deliberate indifference, the court finds that he is entitled to qualified immunity on this issue. Based on the foregoing, the court concludes that Chief Etheredge is entitled to qualified immunity as to the § 1983 claims asserted against him in his individual capacity.

### 2. City of Daleville

The plaintiff alleges that the City of Daleville violated 42 U.S.C. § 1983, which accords private citizens recourse in the wake of constitutional deprivations carried out by individuals acting under the color of state law.[7] Specifically, the plaintiff alleges that the City of Daleville violated constitutional standards by failing to (1) hire capable personnel to perform law enforcement duties, (2) adequately train such persons in the performance of their duties and (3) provide adequate supervision of such persons. The plaintiff also contends that the City of Daleville failed to develop, implement and administer constitutionally adequate policies or procedures designed to guard against jail suicides.

■ A local governing body can be sued directly under § 1983 for monetary, declaratory or injunctive relief when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body." *Monell v. Department of Social Services of New York City,*

---

7. Section 1983 provides in relevant part that:
 "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured...."
42 U.S.C. § 1983.

436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Furthermore, local governing bodies may be sued for constitutional deprivations emanating from "custom" although such a custom is not the product of formal adoption via the body's official decisionmaking regime.[8] *Id.* at 690–91, 98 S.Ct. at 2035–36. Thus, in order to recover against the City of Daleville, the plaintiff must demonstrate that the alleged constitutional deprivation occurred pursuant to a custom or policy of the municipality. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38; *Hearn v. City of Gainesville,* 688 F.2d 1328, 1334 (11th Cir.1982).

In limited circumstances, a municipality's "failure to train" its officials can give rise to a viable § 1983 action. *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In *City of Canton,* the Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204. Therefore, to prevail under his § 1983 action, the plaintiff must demonstrate that the City of Daleville's alleged omission(s) and/or commission(s) in failing to adequately train its officers evidences a "deliberate" or "conscious" decision not to so train. *See id.* at 389, 109 S.Ct. at 1205. As stated in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality): "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made among various alternatives" by local policymakers. 475 U.S. at 483, 106 S.Ct. at 1300 (quoted in *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205).

Before a municipality can be said to have made a "deliberate choice among alternative courses of action, its policymakers must have had 'actual or constructive notice that the particular omission is substantially certain to result in the deprivation of the constitutional rights of their citizens.' " *Young v. City of Augusta,* 59 F.3d 1160, 1172 (11th Cir.1995) (quoting *City of Canton,* 489 U.S. at 396, 109 S.Ct. at 1208). The plaintiff may demonstrate actual or constructive notice by showing either: (1) that the need for a particular type of training is obvious because the employees face clear constitutional duties in *recurrent situations* or (2) "that the need for more or better training is obvious because *a pattern of constitutional violations* exists such that the municipality knows or should know that the corrective measures are needed." *Young,* 59 F.3d at 1172 (emphasis added). The Eleventh Circuit has also commented that

> [t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law. In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.

*Id.* (internal quotations omitted) (citations omitted).

For example, in *Young,* numerous inmates had complained of a lack of adequate treatment for serious medical problems stemming from mental illness. *Id.* Moreover, the mistreatment suffered by the plaintiff occurred over a period of several months. *Id.* at

---

8. In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court of the United States stated:

> Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.

*Id.* at 167–68, 90 S.Ct. at 1613–14. The Court has also explained that

> [i]t would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice ... can establish what is state law.... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text.

*Nashville C. & St. Louis Ry. Co. v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940).

1172–73. Therefore, the court concluded that an inference of deliberate indifference existed. *Id.* at 1173. Also, in *Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir. 1993), *cert. denied*, 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993), the court found that § 1983 liability properly attached to the county for its failure to train employees. In *Vineyard*, there was evidence that the Sheriff's Department received complaints about its officers but did not record them in any manner. *Id.* at 1212.

■■■■■ However, a § 1983 plaintiff cannot rely on a theory of *respondeat superior* to hold a city liable for the individual actions of its police officers. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Hearn*, 688 F.2d at 1334; *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512, 1534 (M.D.Ala. 1994). Neither can a municipality be held liable "solely because it employs a tortfeasor." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991) (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036). Therefore, a plaintiff's actions against a municipal entity will prevail only if a causal link is established between an official policy or custom and the plaintiff's injury. *Byrd v. Clark*, 783 F.2d 1002, 1008 (11th Cir.1986). In fact, the statutory language of § 1983 necessitates proof of an affirmative causal connection between the actions taken under color of state law and the constitutional deprivation. *See Williams v. Bennett*, 689 F.2d 1370 (11th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

■■■ Here, the court finds that the City of Daleville's municipal policy or custom regarding the training and supervision of its officers regarding the handling of suicidal inmates is clearly constitutional. Although the City has no written policy regarding the handling of potentially suicidal prisoners, the officers are taught unwritten policies concerning the handling of suicidal prisoners. *See supra* p. 1330. For instance, officers are instructed to inform the dispatcher if there is a potentially suicidal prisoner in the jail. In light of such information, dispatchers have been instructed to turn up the volume on the audio monitoring system and view the video monitor more closely. Officers are also instructed to deny bed linens to potentially suicidal prisoners and any dangerous or loose clothing, such as belts, shoelaces or necklaces, are removed from the prisoner. Here, it is undisputed that all these procedures were implemented in this case.

As discussed *supra*, the court finds that the aforementioned policy meets the *Schmelz* standard. *See supra* p. 1330. The court finds that this unwritten policy "made an effort to identify and protect potentially suicidal inmates from self-harm." *Schmelz*, 954 F.2d at 1544; *see also Belcher*, 30 F.3d at 1397–99; *Belcher v. City of Foley*, 92–0648–CB–C at 10 (S.D.Ala. June 7, 1996) (Attach. to Def.'s Mot. To Submit Additional Authority, filed June 18, 1996). Moreover, there is "no evidence that [Chief Etheredge] had promulgated an unconstitutional policy or custom." *Id.; see also Belcher*, 92–0648–CB–C at 10. In fact, "whatever the policy's failings it was not facially unconstitutional." *Id.* at 1544; *see also Belcher*, 92–0648–CB–C at 10. Since this policy passes constitutional muster, the court finds that the plaintiff may not maintain a § 1983 cause of action against the City of Daleville because of such a policy. *See Schmelz*, 954 F.2d at 1544 (policy cannot be source of municipal liability under § 1983 unless that policy violated constitutional rights of plaintiff).

■■■ However, this finding does not end the court's inquiry because a local government entity may still be held liable if it has inadequately trained its police officers. *See Belcher*, 92–0648–CB–C at 10–11 (citing *Schmelz*, 954 F.2d at 1544). According to *Young*, there are two methods of establishing a failure to train claim:

First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations. . . . Alternatively, the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.

59 F.3d at 1172 (citations omitted).

Here, the court finds that the plaintiff has failed to meet either prong of the *Young*

standard. *See Belcher,* 92–0648–CB–C at 11 (identical finding). As to the first prong, this case is similar to *Belcher,* 92–0648–CB–C, wherein the court quoted Justice O'Conner in *City of Canton:* "the claim in this case—that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." *Belcher,* 920648–CB–C at 11–12 (quoting *City of Canton,* 489 U.S. at 396–97, 109 S.Ct. at 1208–09 (O'Conner, J., concurring in part and dissenting in part)); *see also Popham,* 908 F.2d at 1564 (no municipal liability where city failed to train jail personnel to screen detainees for suicidal tendencies). There is no evidence which the court can infer that the circumstances presented here are "usual and recurring situations with which [the police in the City of Daleville] must deal." *Id.* (citing *City of Canton,* 489 U.S. at 397, 109 S.Ct. at 1209). In fact, as noted earlier, this was the first suicide at the City jail. There had been three or four suicide attempts in the City jail since the mid 1960s. The court finds that such a history falls far short of establishing an "obvious" need for training officers in handling potential suicidal arrestees.

Regarding the second prong of *Young,* there is no evidence that the members of the City of Daleville police department engaged in any pattern of constitutional violations. In other words, the court finds that the City could not have been on notice that its officers needed additional training in the area of suicide prevention. Hence, the foregoing leads to the sole conclusion that the City of Daleville's motion for summary judgment concerning the § 1983 claims asserted against it is due to be granted.[9]

## B. State Law Claim

■ The court will next address whether it will exercise supplemental jurisdiction over the remaining state claim for wrongful death based upon allegations of negligent hiring, training and supervision. The defendants contend that they are entitled to summary judgment on the state law claim.

The Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5089, substantially altered the law concerning ancillary and pendent jurisdiction. The Act creates, as 28 U.S.C. § 1367, a new provision concerning "supplemental jurisdiction." This provision codifies and revises the law that had developed under the labels "pendent" and "ancillary" jurisdiction. Specifically, subsection (a) of § 1367 dictates that as long as a federal district court has original jurisdiction of a claim, the court

> shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The court stresses that the Act makes supplemental jurisdiction mandatory unless there is a specific statutory exception. One such exception provided in subsection (c) of § 1367 states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) *the district court has dismissed all claims over which it has original jurisdiction,* or
>
> (4) in exceptional circumstances, where there are other compelling reasons for declining jurisdiction.

(emphasis added). In accordance with the foregoing authority, since no claims remain from which the court had original jurisdic-

---

9. The court also notes that to prove municipal liability on a failure to train claim, the plaintiff must show a "conscious choice by policymakers ..., which in turn, caused the [officers'] deliberate indifference." *See Young,* 59 F.3d at 1171–72. The court has previously ruled herein that the officers in this case were not guilty of deliberate indifference toward Mr. Gay. "Because there was no constitutional violation, there can be no § 1983 liability ascribed to the City [of Daleville] for failure to train its officers adequately." *Belcher,* 92–0648–CB–C, at 13.

tion, the court shall dismiss the remaining state claim without prejudice.[10]

### CONCLUSION

In accordance with the foregoing discussion and analysis, the court finds that defendants City of Daleville, Wess Etheredge, Wayne Hunt, Timothy Hicks and Janet Leyrer's motion for summary judgment relating to the § 1983 claims is due to be granted. The court further finds that the remaining state law claims in this case are due to be dismissed without prejudice. A judgment in accordance with this memorandum opinion will be entered separately.

---

**10.** The court does not consider whether the statute of limitations has run on the plaintiff's state law claim as "subdivision (d) of § 1367 recognizes the serious statute of limitations problems a claim may face after it has been 'declined' in a federal action." 28 U.S.C. § 1367 (quoting Practice Commentary at p. 836). Specifically, subdivision (d) recognizes that "it may now be too late under the state statute of limitations to bring a state action on the claim." *Id.* Therefore, subdivision (d) provides "that the [plaintiff] shall have at least a 30–day period [to file] the state action after it is dismissed by the federal court." *Id.*