**Johnny VINEYARD, Plaintiff–Appellee,**

v.

**COUNTY OF MURRAY, GEORGIA, Bill Hansird, as former Sheriff of Murray County, Monte Chastain, Robert Bishop, Defendants–Appellants.**

No. 92–8601.

United States Court of Appeals, Eleventh Circuit.

May 17, 1993.

J. Anderson Davis, Brinson Askew Berry Seigler, Richardson & Davis, Rome, GA, for defendants-appellants.

Jeffrey Jerome Dean, Waycaster Corn Murry & Morris, Gregory Harold Kinnamon, McDonald Kinnamon & Thames, Dalton, GA, for plaintiff-appellee.

Before COX and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

PER CURIAM:

Plaintiff, Johnny Vineyard, brought this 42 U.S.C. § 1983 action against Murray County, Georgia, Robert Bishop and Monte Chastain, two former deputies of the Murray County Sheriff's Department, and William Hansird (Sheriff Hansird), in his individual capacity and his official capacity as sheriff of Murray County during the relevant events. Vineyard alleges that the defendants violated his rights under the Fourth, Fifth, and Fourteenth Amendments.

Vineyard claims that Bishop and Chastain, after arresting him following a domestic dispute, repeatedly threatened him and beat him in the face and chest while he was handcuffed to a hospital bed. Vineyard alleges that the Sheriff's Department had inadequate policies of supervision, training and discipline of its deputies, which caused the violation of his rights by Bishop and Chastain.

The case was tried to a jury. After the close of the evidence, the court directed a verdict in favor of Sheriff Hansird in his individual capacity, but denied motions for directed verdicts for Hansird in his official capacity, the County and Chastain. The jury returned a verdict in favor of the plaintiff and against each of the defendants remaining in the case. The district court denied the defendants' motions for judgment notwithstanding the verdict, for remittitur and to amend judgments and denied Murray County's motion for new trial. The defendants appeal. We affirm.

## I.  FACTS[1] AND PROCEDURAL HISTORY

At the time the events giving rise to this case occurred, Johnny Vineyard and his wife, Debra, were separated and involved in divorce proceedings. Very early one morning, Johnny went to the house where Debra was living. He had been drinking beer and was intoxicated. Debra refused to let him in the house so he broke a glass pane in the door with his fist. The two began to fight. At Debra's request, the woman who lived in the house with her called the Sheriff's Department. By the time Deputies Bishop and Chastain arrived, Debra and Johnny had calmed down and were on the porch waiting for them. The officers arrested Johnny and drove him to a hospital to care for the cuts on his hand.

When they arrived at the hospital, the deputies handcuffed one of Johnny Vineyard's arms to a bed in an emergency room. While in the emergency room he was nervous so he took a pill, the last of a bottle that his doctor had prescribed to control anxiety and depression. The officers discovered the empty bottle and suspected that Vineyard had overdosed on the drug. Along with the medical personnel at the hospital, they attempted to forcibly empty Vineyard's stomach by trying to make him drink a substance that would make him vomit.

Vineyard adamantly refused to drink the substance. He attempted to explain that he had taken only one of the pills and insisted that the medication was prescribed by his doctor. The officers told those who were present in the room to leave and that when they came back, Vineyard would cooperate.

When Vineyard was alone with the officers, while he remained handcuffed to the bed, they beat him repeatedly in the head and chest. A scar from earlier heart surgery and a pacemaker were visible on his bare chest. Bishop delivered most of the blows; Chastain did nothing to stop Bishop and also struck Vineyard several times in the ribs. Vineyard, afraid and in pain, cried out loudly for help, but no one responded.

When the hospital staff returned, the nurse or technician used a tube through Vineyard's nose to lavage or irrigate his stomach. The doctor discovered no pill

---

1. The defendants seek review of the district court's refusal to direct a verdict in their favor. We, therefore, relate the facts in the light most favorable to Vineyard. We note, however, that Vineyard's version of what occurred, particularly at the hospital, was hotly disputed at trial.

fragments when Vineyard's stomach was emptied.

The officers later took Vineyard to the jail, where he continued to suffer considerable pain. He wanted to go back to the hospital so he used his pocket knife to cut his wrist to fake a suicide attempt. His ploy worked; the officers returned him to the hospital. A medical examination revealed that his jaw was broken.

At the time of trial, three and a half years after the morning of the incident, Vineyard continued to suffer substantial pain from the primary injury caused by the beating, a broken jaw. He has undergone two surgical operations and treatment for the pain associated with this injury.

At the time of Vineyard's arrest, Hansird was Sheriff of Murray County. At trial, the court instructed the jury that Hansird had the authority to make policy for Murray County in the area of law enforcement. Sheriff Hansird, Robert Bishop, Monte Chastain and Professor James David White, an expert in police operations, testified regarding the policies of the Murray County Sheriff's Department.

At the close of the evidence, the court directed a verdict in favor of Sheriff Hansird in his individual capacity, but denied his motion for a directed verdict in his official capacity. The jury returned a verdict in favor of the plaintiff and against all remaining defendants. Pursuant to the jury's verdict, the court entered a judgment against the defendants, jointly, awarding $115,000 in compensatory damages, along with $60,000 in punitive damages from

Bishop and $20,000 in punitive damages from Chastain.

## II. ISSUES ON APPEAL

The defendants raise a number of issues on appeal.[2] Only two merit discussion.

Sheriff Hansird, in his official capacity, and Murray County[3] assert error in the district court's denial of their motion for directed verdict based on the lack of evidence to prove a custom of inadequate policies and procedures that caused the abusive treatment of Vineyard.

All of the defendants contend that the district court erred in denying their motion for a mistrial, which was based on the potentially prejudicial impact of certain arguments made by Vineyard's counsel. Defendants sought the declaration of a mistrial because Vineyard's counsel made comparisons and references to the Rodney King incident, a widely publicized case of alleged police brutality in California, and asked the jury to send a message to the Murray County officials.

## III. STANDARDS OF REVIEW

▮ When reviewing the denial of a directed verdict, we consider "whether the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable men could not arrive at a contrary verdict." *Chouinard v. Chouinard*, 568 F.2d 430, 433 (5th Cir.1978).[4] Merely a scintilla of evidence will not be sufficient to avoid a directed verdict; there must be substantial evidence. *Cunningham v.*

---

**2.** In addition to the two issues we discuss, the defendants contend that the district court erred in the following respects: (1) allowing the deposition testimony of Johnnie Jones Allison to be used at trial; (2) failing to grant a new trial because of an excessive verdict; (3) failing to grant a directed verdict in favor of Monte Chastain on the claims that he used excessive force and that he should have intervened to stop Bishop from beating Vineyard; (4) refusing to bifurcate the trial of the individual officers and the trial of the Sheriff and Murray County; (5) refusing to charge the jury according to the defendants' suggested instructions regarding the reasonableness of the use of force. Each of these contentions is meritless.

**3.** "For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." *Owens v. Fulton County*, 877 F.2d 947, 951 n. 5 (11th Cir.1989). The district court explained in its instructions to the jury that the Sheriff is a county official whose acts and decisions can establish the policy for the County. [Trial Transcript, R. 14 at 558–60.]

**4.** This court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

*United States*, 553 F.2d 394, 395 (5th Cir. 1977).

■ We review the district court's denial of a mistrial for abuse of discretion only. *Jonas v. City of Atlanta*, 647 F.2d 580, 586 (5th Cir. Unit B June 1981).

## IV. DISCUSSION

### A. County Liability

■ We begin our analysis of any excessive force claim by "identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). We determine whether a constitutional violation has occurred by applying the standards applicable to that particular constitutional provision. *Id.* 490 U.S. at 394, 109 S.Ct. at 1871. Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise. To attribute liability to a municipality under § 1983, the plaintiff must demonstrate that the municipality had an official policy that was "the moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Parker v. Williams*, 862 F.2d 1471, 1477 (11th Cir.1989) (both citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)).

#### 1. *The Source of the Right To Be Free From Excessive Force*

Our first task is to identify the constitutional right at issue. Vineyard claims that his rights under the Fourth, Fifth and Fourteenth Amendments were violated by the use of excessive force by Chastain and Bishop. It is unclear, however, whether a pretrial detainee's claim that officers used excessive force against him states a cause of action under the Fourth Amendment. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10.; *Wright v. Whiddon*, 951 F.2d 297, 300 (11th Cir.1992). In contrast, the law is well established that pretrial detainees may bring § 1983 actions to redress violations of their rights under the Due Process Clause of the Fourteenth Amendment, which "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (citing *Bell v. Wolfish*, 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979)).

The Defendants do not contest that Vineyard's description of the beating, if true, would constitute a violation of Vineyard's rights whether considered under either the Due Process Clause's protection of pretrial detainees from punishment or the Fourth Amendment's protection from unreasonable seizures. Defendant Chastain argues only the insufficiency of the evidence to prove that Chastain participated in the beating and that he should have prevented Bishop from beating Vineyard, but we find that evidence to be sufficient. Defendant Bishop does not contest the sufficiency of the evidence supporting the jury's verdict against him. Consequently, we need not decide whether the Fourth Amendment, in addition to the Due Process Clause of the Fourteenth Amendment, is a source of constitutional protection of a pretrial detainee's right to be free from the use of excessive force.

■ The finding that Bishop and Chastain violated Vineyard's constitutional rights does not necessarily mean that Murray County is liable for that violation. The doctrine of respondeat superior does not apply in § 1983 cases. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Counties may be liable under 42 U.S.C. § 1983 for deprivations of constitutional rights when the county has an official policy that was the "moving force of the constitutional violation." *Id.* at 694, 98 S.Ct. at 2037.

We address the proof of the County's policies and the evidence of causation below.

#### 2. *Murray County's Inadequate Policies of Training, Discipline and Supervision*

■ The Supreme Court considered the attribution of liability to a municipality on a

claim of inadequate training of the municipality's officers in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197 (1989). In *Canton,* the Court held, "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

Vineyard's claim against Murray County is similar to the one considered by the Court in *Canton.* Whereas the plaintiff in *Canton* presented only a claim of inadequate training, Vineyard claims that the county had inadequate policies for training, supervision and discipline. The district court instructed the jury that the appropriate standard to apply is one of deliberate indifference.

We have noted that a single constitutional violation may result in municipal liability when there is "sufficient independent proof that the moving force of the violation was a municipal policy or custom." *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1504 n. 10 (11th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654, *and* 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 673 (1986). At trial, Vineyard presented evidence regarding this particular incident, and he offered independent evidence that the county's policies regarding the supervision, discipline and training of deputies in the Sheriff's Department were the moving force of the constitutional violation.

The evidence demonstrates that the Sheriff's Department had inadequate procedures for recording and following up complaints against individual officers. Sheriff Hansird testified that it was not unusual to receive complaints. He and Professor White testified that the dispatcher or whoever answers the telephone has discretion about the initial handling of the complaint. Sheriff Hansird also said that the Department does not log complaints. Professor White explained that a policy of logging complaints is important for the warning such recorded complaints can provide. A record of complaints gives the sheriff no-tice that a particular officer may have a problem that could be corrected through reassignment, discipline or training.

The manner in which the Sheriff investigated this incident evidences a policy of deliberate indifference to the rights of the County's inhabitants. To follow up on complaints regarding the officers' treatment of Vineyard, Sheriff Hansird sent Bishop and Chastain, the two officers involved, to obtain statements from the witnesses. The problems with this decision are obvious. Professor White testified that such a procedure violates "every basic tenet" of proper complaint investigation. (R. 12 at 261.).

In addition the evidence indicates that no one in the Department completed a police report describing the circumstances of Vineyard's arrest. Sheriff Hansird testified that the absence of a report was unusual and that he was unsure whether one existed for Vineyard's arrest. Professor White never saw an arrest report for this incident. Bishop did not know if anyone made a report. Chastain did not know if anyone completed a report; he saw only a partial report.

Vineyard presented other evidence of inadequate policies. Although Sheriff Hansird had been sheriff for a number of years, the Department had no policies and procedures manual. Professor White explained to the jury how such manuals give specific guidance to deputies and to their supervisors about appropriate conduct and discipline or training. He concluded by saying, "If you don't give that [the guidance of written policies and rules] to the officers, if you just say go on out there and use your head, it depends on what head they have got on as to which one they will be using in the field." (R. 12 at 265.).

We find substantial evidence supporting the jury's conclusion that Murray County had inadequate policies of supervision, discipline and training of deputies in the Murray County Sheriff's Department and that these policies demonstrated the deliberate indifference of the County to the rights of arrestees to be free from the use of excessive force by the County's deputies.

### 3. County Policies Were the Moving Force of the Violation

■ The existence of an official policy is insufficient to impose liability on the county. *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. Vineyard must also show that the policy was the moving force of the constitutional violation. *See id.* In *Canton*, the Court stated the proper inquiry to be, "Would the injury have been avoided had the employee been trained [and supervised and disciplined] under a program that was not deficient in the identified respect[s]?" *Id.* at 391, 109 S.Ct. at 1206.

The testimony of Professor White supports the jury's finding of causation. When asked to assume Vineyard's version of what occurred at the hospital to be true, Professor White offered his opinion that these events would not have occurred if the county policies were such that officers knew they must report any confrontations, that others could call the Sheriff's Department to report complaints to the department, and that the department would investigate the complaints. The purpose of such policies, White explained, is to stop the use of gratuitous force. He also opined that without at least "the minimum policies in effect to measure [police] behavior and to address problems when they arise, then it's my opinion that it's not if abuses will occur, it's when they're going to occur...." (R. 12 at 270.).

The record includes substantial evidence supporting Vineyard's contentions. The district court, therefore, did not err in denying the motion for directed verdict in favor of Murray County and Sheriff Hansird in his official capacity.

### B. Closing Argument

■ Defendants also challenge the district court's refusal to grant their motion for a mistrial, which they based on the claim that Vineyard's counsel made inappropriate statements during his closing argument. We consider "the entire argument, the context of the remarks, the objection raised, and the curative instruction to determine whether the remarks were 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir.1988) (quoting *Spach v. Monarch Insurance Co.*, 309 F.2d 949, 953 (5th Cir.1962)).

We begin by setting out the portions of the argument to which the defendants object. Vineyard's counsel began his closing argument by stating:

> If there is anything good or positive that came out of the horrible Rodney King beating that most of you witnessed on television, [it] is that the issue of police brutality was brought to the forefront of the news across the country and it gave a lot of people the opportunity to realize that police brutality does occur.

(R. 14 at 500.). The defendants objected without stating a ground. The court sustained the objection and instructed the jury as follows:

> What happened in California, and even though he didn't mention California, that's where it happened, really doesn't have anything to do with this case. This case is to be tried upon the evidence in this case.

(*Id.*). Vineyard's counsel then continued his closing argument by noting that there is no video tape in this case so the jurors would need to evaluate the evidence to decide what happened on the morning in question.

Toward the end of his closing argument, Vineyard's attorney asked the jury to award punitive damages. He said,

> The reason these punitive damages are so important is because the punitive damages send a message back to everybody in Murray County. They send a message to the politicians there, the sheriff that's in office there, and the deputies that are involved there. You, by your verdict today, if you find that Johnny was beaten by the deputies, you'll send a message back to them. If you return a low verdict with low or no punitive damages, you'll tell them that you have given them your approval for this kind of behavior and that it's okay to occasionally beat a fellow up like this.

If you return a large verdict and tell the sheriff it's time to get some of those policies and procedures in effect so this won't happen again, tell the deputies think twice before you get into this kind of situation and use excessive force on a fellow. You'll tell the politicians there. (R. 14 at 514.). At this point, the defendants objected and, outside the hearing of the jury, requested a mistrial. They explained that the combination of references to the Rodney King incident and requests that the jury send a message to the Murray County officials violated the pretrial rulings of the district court. The judge denied the motion and instructed the jury as follows:

Ladies and gentlemen, let me interrupt just a moment to point out to you that the purpose of a verdict is not really to send messages out generally to people. The purpose of a jury verdict, if it is awarding damages, is to compensate a plaintiff if he's entitled to an award of damages, and in some instances it may be appropriate to award punitive damages, if it is appropriate to award punitive damages, then that is done to punish a defendant or defendants, and that's the real purpose of damages, if it's appropriate to award them.

(R. 14 at 515.). The defendants conclude that the court's cautionary instructions were inadequate to cure the harmful effect of the improper argument and that a mistrial was the only appropriate remedy.

We are reluctant to set aside a jury verdict because of an argument made by counsel during closing arguments. *See Allstate*, 845 F.2d at 318. The district judge had the opportunity to observe and control the tone of the argument and to determine its impact on the jury. The challenged arguments were not clearly violative of the pretrial order,[5] and the court gave curative instructions to avoid any prejudice that might otherwise have resulted from the argument. We find no abuse

of discretion in the district court's denial of the defendants' motion for a mistrial.

## V. CONCLUSION

The defendants have not demonstrated error in any of the district court's rulings challenged on appeal.

AFFIRMED.

GODBOLD, Senior Circuit Judge, dissenting:

I would reverse this case. The defendants did not have the kind of trial to which they were entitled. Plaintiff counsel's egregiously improper arguments to the jury would, by themselves, require reversal, but other events added to the unfairness of the trial.

Few matters in modern times have rubbed raw the emotions of individual citizens, and of American institutions, as have the Rodney King events. King was beaten by Los Angeles police on March 3, 1991. The videotape of the incident, fortuitously made by a citizen observer, was released to the public on March 5, 1992 and shown over and over again on television for weeks. Steven S. Lucas and Eric W. Rose, *The Jury Saw All of the Evidence*, L.A. Times, Apr. 30, 1992, at B7. The matter swept across our country like a prairie fire, arousing cries of outrage from television and radio commentators and the print media, from public officials at all levels, and from pulpits across the country. *See, e.g.*, Seth Mydans, *The Police Verdict*, N.Y. Times, Apr. 30, 1992, at A1 (stating that Pres. Bush said he was "sickened" by the video). The U.S. Justice department began a nation-wide review of all police brutality complaints. Mayor Bradley launched an investigation of the Los Angeles Police Department headed by the Christopher Commission, which recommended that L.A. Police

---

5. The pretrial conference discussions among the parties and the judge regarding other trials appear to contemplate specifically the inappropriateness of mentioning other cases involving these parties that are not relevant to this case.

It is unclear from the transcript of the pretrial conference whether the judge considered the inappropriateness of references to other instances of alleged excessive force, such as the Rodney King incident.

Chief Darryl Gates retire. *Id.*[1]

The trial in this case began January 21, 1992, and continued on January 23 and 24, then on January 27 and 28. On the 28th, with the first breath of his closing argument to the jury, plaintiff's counsel threw the skunk in the jury box.

> MR. DEAN (Counsel for plaintiff): If there is anything good or positive that came out of the horrible Rodney King beating that most of you witnessed on television, is that the issue of police brutality was brought to the forefront of the news across the country and it gave a lot of people the opportunity to realize that police brutality does occur.
>
> MR. DAVIS (Counsel for defendants): Excuse me, Your Honor, I'm going to object at this point.
>
> THE COURT: I'll sustain your objection.
>
> MR. DAVIS: That has nothing to do—
>
> THE COURT: What happened in California, and even though he didn't mention it was California, that's where it happened, really doesn't have anything to do with this case. This case has to be tried upon the evidence in this case. So go ahead.

Rec. 14, p. 500. Counsel's remarks were not accidental. They were not inadvertently uttered in the heat of mid-argument. They were not reply in kind. They were deliberate. This was a naked, outrageous, and unprofessional appeal to what was then—and is now—a matter of deep concern and high emotion for millions of Americans.[2]

The similarity of the cases is obvious: a criminal suspect in custody, allegedly drunk or under drugs, allegedly raging out of control and impossible for arresting officers to handle, plus evidence that the suspect is beaten and seriously injured through excessive force against which he is unable to defend himself. Twice counsel worked into his statement the catch phrase "police brutality."

The trial court should have stopped the proceedings instantaneously, declared a mistrial, and sanctioned counsel. Instead, presumably caught by surprise, the court gave a mild corrective instruction to the effect that what happened in California has nothing to do with this case, and that the case was to be tried on the evidence in the case. This was not enough. It was too mild. And it did not address the real problem. Of course the case was to be tried on the evidence. But the judge's comment did not address the crucial concern, which was *the impact of counsel's statement upon the minds of jurors in considering the evidence.* At a minimum the court should have carefully explored with jurors whether they could consider the evidence and reach a fair verdict free of the effect upon their minds of what plaintiff counsel had said, of the matter to which counsel referred, and of the national concerns that had arisen from it. Moreover, the corrective instruction was directed to California matters. But the problem was not merely

---

1. Subsequent events shed additional light on public feelings. State criminal charges against the Los Angeles police officers went to trial on March 4, 1992, six weeks after the instant case began. On April 29, 1992 the jury issued its verdict acquitting the defendants of all offenses except for one count against one defendant, on which the jury was hung and a mistrial declared. Whether rightly or wrongly the verdict was denounced by commentators across America and around the world. *See, From the Nation's Newspapers,* L.A. Times, May 4, 1992, at A9 (quoting American newspapers); *The Whole World Watches—and Reacts—to L.A. Riots,* L.A. Times, May 5, 1992, World Report, at 2 (quoting international newspapers). Los Angeles suffered two days of rioting resulting in 58 dead, 4,000 injured, 12,000 arrested, and $1 billion of damage. *Pulling Together?,* The Economist, May 9, 1992 (U.K. ed.), at 55. Less severe rioting occurred in such widespread cities as Seattle, Atlanta, New York, San Francisco, Las Vegas, and Tampa. Edith Stanley and David Treadwell, *Violence Continues for Second Day,* L.A. Times, May 2, 1992, at A7. Now, when this dissent is written, two officers have been convicted on federal criminal charges.

2. The opinion of this court, n. 5, points out that there were discussions at the pre-trial about the inappropriateness of mentioning other cases of alleged police misconduct. The court did not forbid mention of the Rodney King incident; that did not specifically come up. The implication by plaintiff that the remarks of counsel were excusable because not forbidden ahead of time by court order is disingenuous.

what happened in California. The Rodney King case had inflamed a country and had become a national issue.

Defense counsel objected and moved for a mistrial. This court points out that he did not state a ground for his objection. But the court sustained the objection as soon as it was uttered. Counsel then began to state a ground, and the court terminated the dialogue with its remark about matters in California. In any event, if ever there was a case where everyone knew the ground of the objection, this was it.

The above is not all. Plaintiff's counsel did not stop after the corrective instruction. He drew the second arrow from his quiver, "there was no video tape in this case," a backhand way of reminding jurors again of the alleged brutalization of Rodney King, which had been brought to light, and then memorialized, by a videotape.

I do not share the confidence of the trial court, stated in denying a post-trial motion, and of my colleagues, that, bearing in mind the court's instructions, counsel's improper remarks really did not make a difference. This case could not be cured with a Band-aid.

Later counsel made another inappropriate argument on a different subject, this time with respect to punishing the politicians of the county by awarding punitive damages. The argument and the court's response are set out in the opinion of this court. Perhaps this statement by itself was not ground for mistrial. But defense counsel pointed to the cumulative prejudice created by the Rodney King statement and the "punish the politicians" statement.

Plaintiff should not be rewarded in this case by judgments totalling $195,000, an amount that the trial court recognized, in ruling on pre-trial motions, was "at the outer limits of an acceptable verdict."[3]

While it is not necessary that I address the matter in full detail, I would reverse on the sole ground that the court abused its discretion in allowing testimony by deposition of Johnnie Jones Allison. Ms. Allison was plaintiff's key witness. By her deposition she testified at length to plaintiff's being beaten and otherwise mistreated at the hospital. The evidence of what occurred there, as this court notes, was hotly disputed. Ms. Allison is the source of substantial parts of the recital of evidence in plaintiff's favor set out by this court.[4]

Briefly summarizing a series of events, here is what happened about the deposition. After trial proceedings had begun plaintiff's counsel notified the court that he would offer the deposition of Ms. Allison on the ground she was unable to attend because of illness. *See* F.R.Civ.P. 32(a)(3)(C), FRE 802, 804(a)(4), (b)(1). Defendant objected and a couple days later, after inquiry, produced evidence tending to show Ms. Allison was not unable to come to court. Plaintiff was never able to prove that Ms. Allison was physically unable to appear. Indeed, after several submissions to the court extending over several days, the court found that plaintiff had only succeeding in buttressing that Ms. Allison was not physically unable to come. Plaintiff's counsel knew, from talking to Ms. Allison about trying to get a doctor's excuse for her, that she did not want to come to court. When unavailability because of illness began to abort as a ground, plaintiff's counsel engaged in a belated whirlwind of activity trying to serve a subpoena on Ms. Allison at her home, through a private detective, a relative of Ms. Allison, and by counsel himself. *See* Fed.R.Civ.P. 32(a)(3)(D). But she had departed ahead of the process servers. Defense counsel tried to find her with a subpoena but could not.

Faced with this situation, the court recognized that the issue before it had changed from alleged unavailability because of illness to inability to procure testimony of the witness by subpoena. As the court phrased it, the question was "diligence in trying to get her as it might

---

**3.** Plaintiff claims attorneys fees in the amount of approximately $130,000. The record reflects that the parties resolved this claim without the necessity of any action by the court. It does not

reveal an amount, but it is fair to assume that the amount was not nominal.

**4.** See note 1 of this court's opinion.

impact on unavailability." Rec. 13, p. 359. The court orally discussed the events that tended to show inability to serve a subpoena and held that, since Ms. Allison could not be reached by subpoena and adversary counsel had been present at her deposition with adequate opportunity to cross examine, the deposition would be allowed as testimony. But a critical finding was missing. The court had recognized that diligence by the plaintiff was an issue, but it never addressed that question.

Establishing a predicate for using a deposition over objection is not a mere nicety. Under FRE 801(c) the deposition is hearsay. *U.S. v. Salerno,* — U.S. —, — — —, 112 S.Ct. 2503, 2506–07, 120 L.Ed.2d 255 (1992). Fed.R.Civ.P. 32(a)(3) simply acts as an exception permitting admission of deposition testimony when the witness is unavailable to testify at trial. *See* Michael H. Graham, *Federal Practice and Procedure* § 6793, at 776 n. 2 (interim ed. 1992); 11 James W. Moore et al., *Moore's Federal Practice* § 804.04[1], at VIII–262 (2d ed. 1993). Deposition testimony may also be offered as a hearsay exception under FRE 804(b)(1), but that too requires unavailability. In considering unavailability under Rule 32(c)(3) and under FRE 804 plaintiff must show appropriate diligence. Moore, *supra,* § 804.03[5], VII–255–58. The court did not address this point. It was error to permit use of the deposition without proof of, or even consideration of, diligence.

This case should be tried properly with restraint on the part of plaintiff's counsel and with Ms. Allison present or proper predicate laid for her deposition. Defendants are entitled to no less.