[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-17096

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00054-CV-WCO-2

JASON BESHERS,
Individually and as administrator of the
Estate of David Beshers,

Plaintiff-Appellant,

versus

SCOTT PATRICK HARRISON,
JOHN WHITWORTH, MATT RAMEY,
LINDA MARIE ADDIS, Individually
and in their official capacities as employees
of the City of Toccoa, Georgia Police
Department, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 14, 2007)**

Before BIRCH and BLACK, Circuit Judges, and PRESNELL,* District Judge.

BLACK, Circuit Judge:

---

* Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

In this appeal, we consider whether Officer Scott Harrison, who allegedly terminated a high-speed chase by causing David Beshers' vehicle to crash, violated Beshers' Fourth Amendment right to be free from unreasonable seizures. We affirm the district court's grant of summary judgment, having determined that no constitutional violation occurred.

## I. BACKGROUND[1]

On the afternoon of April 20, 2002, the City of Toccoa Police received a report from Bev's Quick Stop that a customer (later identified as Beshers) tried to steal beer after the clerk refused to sell it to him. The customer appeared to be intoxicated and had already been in the store a number of times that day to purchase alcohol. Officer Scott Harrison responded to Bev's Quick Stop and viewed video surveillance of the suspect's truck. Shortly after leaving Bev's, Harrison noticed a truck matching the description of the suspect vehicle at a nearby gas station. Harrison watched the truck turn out of the gas station and run a stop sign as it entered Highway 17-A, a busy four-lane road with shopping centers, fast food restaurants, Wal-Mart, and an occasional hotel on either side. Harrison

---

[1] We are required to view all facts and draw all reasonable inferences in favor of the non-moving party when reviewing a grant of summary judgment. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2, 125 S. Ct. 596, 597 n.2 (2004). The Supreme Court recognized in *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007), that this typically means adopting the plaintiff's version of facts in a qualified immunity case. Nonetheless, in this case, as in *Harris*, we have the benefit of viewing two videotapes from the patrol cars involved in the pursuit. Thus, to the extent Appellant's version of the facts is clearly contradicted by the videotapes, such that no reasonable jury could believe it, we do not adopt his factual allegations. *Id.*

2

activated his emergency lights, triggering his video equipment to record, and began to follow the car.

After proceeding a few hundred yards, Beshers pulled into a shopping center and stopped just long enough to let a passenger out of his car. He then drove out of the parking lot and proceeded south on Highway 17-A. Harrison turned on his sirens, called the truck's license plate into dispatch, and reported that the suspect vehicle was not stopping. Both vehicles accelerated to 55 miles per hour (mph) in the 45 mph zone. As Beshers fled, he wove through traffic, occasionally straddling both southbound lanes.

Corporal Matt Ramey and Officer Linda Addis, were traveling northbound on Highway 17-A when they heard the radio report. According to Addis, Ramey ordered her to perform a roadblock by driving the police vehicle directly in the path of Beshers' oncoming truck. Beshers swerved to avoid the roadblock, crossing the center line and driving into oncoming traffic. Beshers then returned to his proper lane and continued driving south on Highway 17-A. About this same time, Officer John Whitworth joined the pursuit.

Beshers proceeded down Highway 17-A, followed in line by Harrison, Whitworth, and Addis and Ramey. Beshers continued to weave through traffic and force numerous motorists to the side of the road. As he approached the intersection of Highway 17-A and Rose Lane, his lane of travel was blocked by a

3

car stopped at a red light. To avoid stopping, Beshers drove onto the right shoulder of Highway 17-A. As he pulled alongside the car, the driver–Francis Lyon–turned right onto Rose Lane. The two cars collided. Beshers turned right and accelerated down Rose Lane.

After the collision, Whitworth took the lead pursuit position. Beshers soon turned onto Georgia Highway 145, a narrow, winding two-lane country road with homes on both sides. At this point, Harrison passed Whitworth to regain the lead pursuit position. Beshers continued to improperly pass vehicles by crossing the double center line. He also drove on the wrong side of the road and forced motorists to pull to the side of the road. In this stretch alone, Beshers crossed the center double line at least six times, while maintaining speeds between 55 and 65 mph. After multiple attempts, Harrison passed Beshers. Harrison testified he intended to encourage Beshers to slow down and to warn oncoming traffic.

Almost immediately, Beshers swerved into the northbound lane in an apparent attempt to pass Harrison. Harrison blocked Beshers by swerving in front of him, and Beshers' truck rammed into the back of the police cruiser.[2] Beshers then swerved back to the southbound lane and Harrison followed. Beshers drove

---

[2] Beshers' son, Jason Beshers (Appellant), after viewing the videos, alleges the ramming was accidental and occurred because Harrison slammed on his brakes after passing Beshers. We cannot determine from the videotapes whether or not Harrison applied his brakes and caused the ramming.

off the road and attempted to pass Harrison on the right shoulder. As Beshers came around the front of the police cruiser and tried to return to the road, the front passenger side of Harrison's cruiser clipped the rear quarter of Beshers' truck, causing it to flip several times.[3] Beshers died on impact.[4]

On March 10, 2004, Beshers' son, Jason Beshers (Appellant) filed suit under 42 U.S.C. § 1983 against the City of Toccoa (City), Toccoa Chief of Police Frank Strickland, and Toccoa Officers Scott Harrison, John Whitworth, Matthew Ramey, and Linda Addis (collectively Defendants), alleging, *inter alia*, a violation of his Fourth Amendment right to be free from unreasonable searches and seizures.[5] In

---

[3] A review of the pursuit videotapes shows that a reasonable juror could conclude that either (1) Harrison intentionally pushed Beshers off the side of the road and pressed the police cruiser against the rear quarter of Beshers' truck, or (2) the rear quarter of Beshers' truck struck the front passenger side of the police cruiser as Beshers tried to pass Harrison. At this stage in the proceedings, we are compelled to view the facts and draw all reasonable inferences in the light most favorable to Beshers. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2, 125 S. Ct. 596, 597 n.2 (2004). Therefore, we will assume Harrison intentionally caused the collision.

[4] The inquiry in an excessive force case is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989). Although not relevant to the inquiry, we note that after the accident, the Georgia Highway Patrol Specialized Collision Report Team completed an independent investigation of the crash. The report found that Beshers struck Harrison's patrol car multiple times and that Beshers was "highly intoxicated" at the time of the incident. The Report concluded: "There is no evidence to suggest that there was any intentional act on behalf of the Toccoa Police Officers involved, to do anything other than get an intoxicated driver off the highway by utilizing accepted police methods of dealing with a driver who refuses to yield to a uniformed officer in a marked patrol car." The Report was attached to Defendants' motion for summary judgment. Additionally, the City of Toccoa and Chief of Police Strickland investigated the incident and determined that none of the officers violated the Toccoa Standard Operating Procedures.

[5] Appellant also alleged a violation of Beshers' Fourteenth Amendment right to due process and a number of state law claims that are not before us on appeal.

response, Defendants filed a motion for summary judgment, claiming the individual defendants were entitled to qualified immunity. They also argued Appellant could not provide evidence to support a claim for supervisor or municipal liability.

On November 17, 2004, the district court granted the motion for summary judgment as to all Defendants. First, the court determined there was no evidence Officer Harrison intentionally caused his vehicle to collide with Beshers, so no Fourth Amendment seizure occurred. In the alternative, the court concluded that even if a constitutional violation occurred, Harrison would be entitled to qualified immunity because there was no "clearly established" law that would have put Harrison on notice that his conduct violated Beshers' constitutional rights. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (holding that qualified immunity shields government officials from liability if their acts do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known"). The district court explained that under the then-controlling law of *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985), a police officer could use deadly force to seize a fleeing felony suspect only when the officer (1)"ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or others"; (2) reasonably believed that the use of deadly force was necessary to prevent escape; and (3) gave a warning, if feasible, about the possible use of deadly force. The court found

6

Harrison had probable cause to believe Beshers posed an immediate threat to others because he was driving erratically, was suspected to be intoxicated, and had struck another motorist with his vehicle. The court thus concluded it was not "obvious" that *Garner* prohibited the use of deadly force to stop Beshers. The court further found that Appellant failed to identify any "case that demonstrates a clearly established rule prohibiting police officers from engaging in high-speed pursuits or attempting to use a rolling roadblock to slow or stop a fleeing suspect who the officers reasonably suspect poses a danger to others."[6]

On December 15, 2005, Jason Beshers timely appealed the district court's grant of summary judgment. After initial briefing and oral argument, the Supreme Court issued *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007), which discusses the use of deadly force during a high-speed police pursuit. After analyzing the impact of Harris and carefully reviewing the record, we affirm the district court's grant of summary judgment and hold that Harrison did not violate Beshers' Fourth Amendment right to be free from excessive force during a seizure.[7]

---

[6] The district court also granted summary judgment to the City of Toccoa, Chief of Police Frank Strickland, Corporal Matt Ramey, and Officers John Whitworth and Linda Addis.

[7] We further conclude the district court did not err by granting summary judgment to the City of Toccoa, Chief of Police Frank Strickland, or Corporal Matt Ramey. We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred. *See Rooney v. Watson*, 101 F.3d 1378, 1381 n.2 (finding the plaintiffs could not maintain a failure to train action against the county because the automobile accident did not rise to a level of violating their constitutional rights); *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a violation of specific rights has

## II. DISCUSSION

Appellant argues, *inter alia*, the district court erred by granting summary judgment in favor of Harrison after (1) finding Beshers was not subject to an unlawful seizure in violation of the Fourth Amendment, and (2) determining that even if a violation occurred, Officer Harrison was nonetheless entitled to qualified immunity. We review the district court's grant of summary judgment *de novo*, resolving all genuine disputes of material fact in favor of Beshers. *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Harrison's entitlement to qualified immunity is a question of law to be reviewed *de novo*. *Cagle v. Sutherland*, 334 F.3d 980, 985 (11th Cir. 2003).

Qualified immunity protects government officials performing discretionary functions from individual liability as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would

---

occurred can the question of § 1983 municipal liability for the injury arise."); *see also Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (stating that a claim for supervisory liability fails where there is no underlying constitutional violation). Appellant did not appeal the court's grant of summary judgment to Officers John Whitworth or Linda Addis.

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). "The purpose of this immunity is to allow governmental officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

"In resolving questions of qualified immunity, courts are required to resolve a 'threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). "If, and only if, the court finds a violation of a constitutional right," does it ask whether the right was clearly established at the time of the violation. *Id*. We thus turn to the threshold question in this case: whether Officer Harrison violated Beshers' Fourth Amendment rights.

The Fourth Amendment provides the right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004); *see also* U.S. CONST. amend. IV. To establish an excessive force claim, the Appellant must first show Beshers was "seized" within the meaning of the Fourth Amendment. *See Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir.

9

2003). A Fourth Amendment seizure occurs when "there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 1381 (1989) (emphasis in original).[8] In *Brower*, the United States Supreme Court explained that if a police cruiser pulls alongside a fleeing car and sideswipes it, thereby producing a crash, a seizure occurs. *Id.* at 597, 109 S. Ct. at 1381. But if a suspect in a police chase unexpectedly loses control of his car and crashes, no seizure occurs. *Id.* This is because the crash was not caused "*through means intentionally applied.*" *Id.* (emphasis in original); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S. Ct. 1708, 1715 (1998) ("[N]o Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him.") (quoting *Brower*, 489 U.S. at 597, 109 S. Ct. at 1381).

Here, Officer Harrison maintains, and the district court agreed, there is no evidence he intentionally caused his vehicle to collide with the decedent. Nonetheless, viewing the evidence in the light most favorable to the Appellant, we

---

[8] In *Brower*, the Court found the decedent was "seized" when the stolen car he was driving crashed into a police roadblock. 489 U.S. at 599; 109 S. Ct. at 1383. The Court reasoned: "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. . . . Brower was meant to be stopped by . . . the roadblock–and . . . was so stopped." *Id.* at 599, 109 S. Ct. at 1382.

10

conclude a reasonable juror could determine Harrison intentionally collided with Beshers. Accordingly, for purposes of this appeal only, we operate under the presumption that Harrison "seized" Beshers, as that term is defined under the Fourth Amendment.

We must next decide whether the force used to effectuate the seizure was reasonable. "[A] '[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Brower*, 489 U.S. at 599, 109 S. Ct. at 1382-83. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger*, 381 F.3d at 1248 (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989)). "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Ferraro*, 284 F.3d at 1197 (internal quotation marks and citations omitted). The inquiry should be viewed from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of

11

force that is necessary in a particular situation." *Connor*, 490 U.S. at 396-97, 109 S. Ct. at 1872.

As the district court noted, the Supreme Court found in *Tennessee v. Garner* that, depending on the circumstances, the use of deadly force to prevent the escape of a felony suspect may or may not be constitutionally reasonable. 471 U.S. at 11, 105 S. Ct. at 1701. The Court explained:

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect [with deadly force]. . . .
>
> . . . [But] [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12, 105 S. Ct. at 1701; *see also Brosseau v. Haugen*, 543 U.S. 194, 197-98, 125 S. Ct. 596, 598 (2004). After *Garner*, we required three preconditions for the use of deadly force. An officer must: "'(1) ha[ve] probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believe[] that the use of deadly force [is] necessary to prevent escape; *and* (3) ha[ve] given some warning about the possible

12

use of deadly force, if feasible." *Cox*, 343 F.3d at 1329-30 (quoting *Garner*, 471 U.S. at 11-12, 105 S. Ct. at 1701) (emphasis in original).

Recently, however, in *Scott v. Harris*, the Supreme Court limited *Garner's* applicability. 127 S. Ct. 1769 (2007). The Court noted that in *Garner*, they applied the Fourth Amendment's reasonableness test to a police officer shooting a "young, slight, and unarmed burglary suspect . . . in the back of the head while he was running away on foot." *Harris*, 127 S. Ct. at 1777 (quoting *Garner*, 471 U.S. at 4, 21, 105 S. Ct. at 1698, 1706) (internal quotation marks omitted). The Court found that "[w]hatever *Garner* said about the factors that *might have* justified shooting the suspect in that case, such 'preconditions' have scant applicability" to the reasonableness of the use of deadly force in a high-speed car chase terminated by an intentional collision. *Harris*, 127 S. Ct. at 1777 (emphasis in original). "A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person[,] [n]or is the threat posed by the flight on foot of an unarmed suspect even remotely comparable to the extreme danger to human life posed by respondent in this case." *Id.* (internal quotation marks and citations omitted) (referring to a fleeing motorist driving at high speeds in an effort to elude police). The Court emphasized that "[w]hether or not [the Officer's] actions constituted application of 'deadly force,' all that matters is whether [the Officer's] actions were reasonable." *Id.* at 1778.

13

The *Harris* Court reiterated that in determining the reasonableness of a seizure it "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 2642 (1983)). Thus, in a ramming case, the risk of bodily harm the officer's actions pose to the suspect must be weighed against the governmental interests of ensuring public safety and eliminating the threat caused by a fleeing suspect. *Id.* After considering how a court "weigh[s] the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person[,]" the Court stated:

> We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was [the suspect], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high speed flight that ultimately produced the choice between two evils that [the officer] confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing [the suspect] for nearly ten miles, but he ignored their warning to stop. By contrast, those who might have been harmed had [the officer] not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for Scott to take the action that he did.

*Id.* (footnote omitted).

The Court specifically rejected the notion that police can protect the public by ceasing a pursuit. *Id.* at 1779. It explained that calling off a pursuit does not guarantee a suspect will stop driving recklessly and may create "perverse

14

incentives" for individuals to flee and drive recklessly to evade arrest. *Id.* Instead, it "la[id] down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.*

When we apply *Harris* to the facts of this case, we have no doubt that Harrison's alleged use of deadly force to stop Beshers did not violate the Fourth Amendment. As we noted above, to determine whether deadly force was reasonable we must determine whether Officer Harrison's actions were objectively reasonable in light of the facts and circumstances of the pursuit. *See Herrington*, 381 F.3d at 1248 (citing *Connnor*, 490 U.S. at 397, 109 S. Ct. at 1872). From Harrison's perspective, he had reason to believe Beshers was a danger to the pursuing officers and others and was driving under the influence of alcohol. Harrison observed Beshers weaving in and out of traffic, crossing the double yellow center line, driving on the wrong side of the road, and forcing others off the road. He witnessed Beshers crash into Ms. Lyon's vehicle and was rammed several times by Beshers' truck while traveling between 55 and 65 mph on Highway 145. As in *Harris*, Beshers "intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight." *Harris*, 127 S. Ct. at 1778. He ignored the "[m]ultiple police cars, with blue lights flashing and sirens blaring"

15

that had been chasing him for nearly 15 minutes. *Id.* Based on these circumstances, we conclude that if Harrison intentionally used deadly force to seize Beshers, the use of such force was reasonable.

We therefore hold Harrison did not violate Beshers' Fourth Amendment right to be free from excessive force during a seizure. Having found no constitutional violation by Harrison, we need not proceed to the second step of the qualified immunity analysis. *See Harris*, 127 S. Ct. at 1774.

### III. CONCLUSION

Based on the foregoing, we affirm the district court's grant of summary judgment to the Defendants on all of Appellant's federal law claims.

**AFFIRMED.**

16

PRESNELL, District Judge, concurring:

In light of *Harris*, I am compelled to concur in the panel decision. However, I think the panel opinion fails to portray the facts in the proper light. We start with the premise that officer Harrison applied deadly force to seize Beshers. The question is, was that use of force objectively reasonable under the facts and circumstances of this case? When the facts of this case are viewed, as they must be at this stage, in the light most favorable to the Appellant, I believe they demonstrate that this is a much closer case than *Harris*. My view of those facts, assessed in light of the appropriate standard, is as follows:

## I.Background

On April 20, 2002, Officer Scott Harrison was dispatched to Bev's Quick Stop, a convenience store in Toccoa, Georgia. A clerk at the store, believing a customer was intoxicated, had refused to sell him beer. When Harrison arrived he was told the man had put the beer down, gotten into a vehicle, and left. The clerk showed Harrison a video of the man's truck. Harrison was not told how many people were in the truck, or whether the man who had attempted to buy the beer was the driver or a passenger.

According to Harrison, just after leaving Bev's Quick Stop he encountered David Beshers's pickup and watched it run a stop sign. Harrison then turned on his emergency lights, which activated his cruiser's video recording system. After

17

traveling a short distance down Highway 17-A, Beshers signaled and pulled into a

shopping center parking lot. He stopped long enough to drop off a passenger, who

was carrying a white plastic bag containing something about the size of a six pack,

and then pulled back onto Highway 17-A. Harrison turned on his siren and

followed him onto the highway. Shortly thereafter, Harrison radioed in the truck's

license plate number. Harrison testified that at this point, Beshers was wanted for

nothing more significant than misdemeanor offenses.

As Beshers and Harrison proceeded down Highway 17-A, Officer John

Whitworth made a u-turn and joined the chase.[1] Officer Linda Addis, also

approaching Beshers and Harrison from the opposite direction on 17-A, angled into

an intersection and stopped her cruiser directly in Beshers's path, halting perhaps 10

feet in front of him.[2] Beshers was forced to brake and swerve to avoid crashing into

this roadblock.[3] This maneuver constituted the use of deadly force, long before

Beshers was even allegedly suspected of having committed a felony.

---

[1]The recording system in Whitworth's cruiser also videotaped the chase but for an unknown reason it has no audio.

[2]The recording system in Addis's cruiser had neither audio nor video, also for unknown reasons.

[3]The panel opinion notes that Beshers drove "into oncoming traffic," suggesting that Beshers simply chose to menace other drivers. The videotape does not support such a suggestion. Addis stopped her cruiser at an angle across Beshers's lane, with its front much closer to Beshers's truck than its rear. Judging from the video, if Beshers had swerved to the right, away from oncoming traffic, he likely would have run into the nose of Addis's cruiser. It should also be noted that upon clearing Addis's cruiser, Beshers promptly returned to the proper lane, and he did so without encountering any oncoming traffic.

18

After returning to the proper lane, Beshers proceeded down Highway 17-A. The video does not show Beshers driving erratically or forcing any motorists off the road. Beshers changed lanes several times, and some drivers slowed and pulled to the edge of the pavement – not off of it – presumably in response to the parade of officers with flashing lights and sirens. At the intersection of Highway 17-A and Rose Lane, Beshers came up behind a car in the right lane, which was stopped at a red light. Beshers swerved onto the right shoulder to go around the car, which was driven by Francis Lyon. As Beshers pulled alongside Lyon, she began to make a right turn, which apparently resulted in her vehicle sideswiping his truck.[4] Beshers then turned right onto Rose Lane.[5]

Deputy Brian Perrin of the Stephens County Sheriff's Office, who happened to be stopped on Rose Lane at the intersection, witnessed the apparent collision from a few feet away. As Harrison made the right turn onto Rose Lane in pursuit of Beshers, he shouted "Go! Go!" out his window to encourage Perrin – a personal friend – to join the chase. Perrin contacted his agency for permission. Perrin told

---

[4]It is impossible to tell, from the video, whether the two vehicles collided. The Toccoa officers subsequently claimed to have perceived this collision as an intentional assault by Beshers on Lyon. But the video clearly shows (1) Beshers pulling alongside Lyon,(2) Lyon turning right, and (3) Beshers immediately jerking the nose of his truck to the right – *away* from Lyon, to avoid hitting her.

[5]It is not clear whether Beshers had originally intended to turn right on Rose Lane or to pass Lyon on the shoulder and continue on Highway 17-A. Beshers signaled his left-hand turn into the shopping center parking lot and the subsequent left turn from Rose Lane onto Georgia Highway 145, but did not activate his turn signal as he approached Rose Lane.

his agency that he saw a collision, but he did not characterize it as a felony assault. Instead, Perrin reported that the basis for the pursuit was suspicion of driving under the influence. The Stephens County Sheriff's Office only allowed pursuits in cases involving forcible felonies. Based on Perrin's description, his supervisor did not believe such a felony had been committed and refused to allow him to join the chase.

At a "T" intersection with Georgia Highway 145, Beshers signaled and turned left, heading south.[6] While on Highway 145, Beshers crossed the center line numerous times to pass other cars or to round curves. Each time he did so, he fully returned to the southbound lane before encountering oncoming vehicles. Again, the video does not show Beshers driving erratically or forcing other drivers off the road, although cars continued to slow and pull to the edge of the pavement as Beshers and the officers approached. At one point while traveling on Highway 145, Corporal Matt Ramey ("Ramey"), who was in the vehicle driven by Addis, radioed dispatch to relay the reasons for the pursuit. He listed "reckless driving," "leaving the scene of an accident" and "possibly, assault with a motor vehicle," in that

---

[6]The video shows that Highway 145 – or at least the section of it on which this pursuit occurred – is a rural stretch of highway, with no sidewalks or pedestrian traffic, and only sparse vehicle traffic. Corporal Matt Ramey, who was in the vehicle driven by Addis, testified that the area where the crash occurred was "a very unpopulated area. I mean, there's not much traffic. There's not many people. You know, we went from the middle of a municipality, in the middle of a town, out, down a two-lane road, where it becomes a little safer situation."

20

order.[7] Harrison subsequently testified that, at this point, he did not believe that Beshers posed an immediate threat to the safety of any officer or of the public.

A short time thereafter, Harrison passed Whitworth to become the lead pursuer. He made a number of attempts to pass Beshers, but was repeatedly forced to return to the southbound lane due to oncoming traffic or, in at least one case, limited visibility. Finally, Harrison was successful in passing Beshers. As Harrison pulled alongside and then ahead of Beshers, Beshers did not attempt to ram him or run him off the road.[8]

Harrison completed his pass of Beshers and pulled back into the southbound lane. Almost immediately thereafter, Beshers pulled across the center stripes, apparently attempting to pass Harrison in the northbound lane. Harrison immediately swerved into the northbound lane in front of Beshers and applied his brakes.[9] Beshers then swerved back into the southbound lane, straightening out just before his passenger-side tires touched the white line near the edge of the

---

[7]In addition to the use of the word "possibly," Ramey's tone of voice at least arguably suggested he is not convinced any such assault occurred.

[8]Harrison subsequently testified that he passed Beshers to be in a better position to warn oncoming traffic and in hopes of discouraging Beshers from continuing to flee, but he did not broadcast such a statement during the pursuit.

[9]Although the videotape from Whitworth's vehicle is not crystal clear, watching it several times in slow motion has convinced me that it is at least more likely than not that Harrison's brake lights came on just before Beshers hit him from behind. In any event, the Whitworth video does not "clearly contradict" Appellant's contention on this point. As such, the court is required to assume that Harrison, not Beshers, initiated the first collision between them.

21

pavement. Harrison also swerved back into the southbound lane. As Harrison did so, his cruiser was no longer entirely ahead of Beshers's truck, either because he had slowed or because Beshers had accelerated (or both). As a result, when Harrison swerved into the southbound lane, the right rear of his cruiser collided with the left front of Beshers's truck, forcing Beshers to the right, partially off the paved surface. Harrison continued ramming the passenger side of his cruiser into the driver's side of Beshers's truck, forcing Beshers completely off the road and onto the unpaved shoulder. While doing so, Harrison moved so far over to the right that his passenger-side tires left the pavement.

Driving on the shoulder, Beshers slowly nosed his truck ahead of Harrison's cruiser. Despite Harrison's efforts to force him farther off the road, the two front wheels of Beshers's truck re-entered the paved surface.[10] Once Beshers's front two wheels were on the pavement, Harrison hit him again in the side. This final contact caused the truck's two rear wheels to slide to the right on the dirt shoulder. As the truck's back end came around to the right, the truck began to roll. Beshers died in the crash that followed, approximately fifteen minutes after Harrison first began chasing him.

## II.DISCUSSION

[10]It is not clear from the video whether this occurred because Beshers was trying to return to the road or because a collision with Harrison's cruiser forced the back end of Beshers's truck to the right, causing its nose to go left, back toward and onto the highway.

When the foregoing facts are viewed in the light most favorable to Beshers, one is forced to conclude that his conduct was not particularly heinous. Leaving aside for the moment that he was fleeing the police, for fifteen minutes David Beshers exceeded the speed limit by up to 10 mph, illegally wove in and out of traffic, and ran some stop signs. Though such conduct is undeniably dangerous, you would be hard-pressed to find a reasonable person who felt that such activities, standing alone, warranted death. Indeed, society expects such conduct from law enforcement officers and ambulance drivers, among others, and shrugs off such conduct when engaged in for the right motive, such as to rush an injured friend to the hospital.

But Beshers engaged in this conduct while being chased by the police. Given that predicate, the law says that the fact that he did not try to use his truck as a weapon does not matter. The fact that police were trying to apprehend him for relatively minor, nonviolent crimes does not matter. The fact that he did not actually harm anyone – aside from, perhaps, sideswiping Lyon – is of no consequence. Nor does it matter that, shortly before he began to utilize deadly force, Harrison had no subjective belief that Beshers posed a danger to himself or others.[11]

---

[11]Indeed, the pursuing officers demonstrated a willingness to use deadly force against Beshers – in the form of Addis's roadblock – long before his driving posed a significant threat to others.

Beshers unquestionably endangered innocent bystanders while engaging in an activity that had no societal benefit. Under the Fourth Amendment balancing test applied in *Harris*, the "actual and imminent threat to the lives" of the innocent posed by Beshers' conduct outweighs the "high likelihood of serious injury or death" to Beshers posed by Harrison's efforts to terminate the chase, because Beshers "intentionally placed himself and the public in danger by unlawfully engaging in ... reckless, high-speed flight." *Harris*, 127 S.Ct. at 1778. *Harris* compels me to conclude that, as a matter of law, Harrison had the right to end the chase by killing Beshers – or, to utilize the language of the *Harris* court, Harrison's attempt to terminate the dangerous high-speed car chase, which threatened the lives of innocent bystanders, did not violate the Fourth Amendment, even though it placed Beshers at serious risk of injury or death. *Id.* at 1779.

In this case, that could very well be the proper result. It is certainly conceivable that a jury could weigh all the evidence (rather than viewing it in the light most favorable to Beshers) and decide that Harrison's use of deadly force was justified. A reasonable juror could reach this result, even though Beshers was suspected of comparatively minor offenses, and even though we have all witnessed hundreds of vehicles speeding, passing illegally, and running stop signs without causing an accident.

24

Yet this decision troubles me. Realistically, a suspect fleeing the police in a car will inevitably violate some traffic laws. By doing so, he will endanger the lives of innocent motorists (as well as the pursuing officers).[12] And that danger will always outweigh the threat posed to the suspect by the officer's use of deadly force, because the suspect is the one who chose to put everyone else at risk by refusing to stop. In other words, the danger to the suspect is given no weight. For all of its talk of a balancing test, the *Harris* court has, in effect, established a *per se* rule: Unless the chase occurs below the speed limit on a deserted highway, the use of deadly force to end a motor vehicle pursuit is always a reasonable seizure.

As a practical matter, a police officer's qualified immunity to use deadly force in a car chase situation is now virtually unqualified. *Harris* and this opinion allow a police officer to use deadly force with constitutional impunity if the fleeing suspect poses any danger to the public. In my humble opinion, I believe we will live to regret this precedent.

If a balancing test is to have any real meaning, a jury ought to be deciding whether the risk posed by the fleeing suspect is too minimal, or the suspected crime too minor, to make killing him a reasonable way to halt the chase. Nevertheless, based on my reading of *Harris*, that decision has been taken away from the jury

---

[12]As attested by the dangerous instrumentality doctrine, the operation of a motor vehicle is inherently dangerous to others. Thus, the chase occasioned by a fleeing motorist will itself arguably create an immediate and substantial potential for harm to the traveling public.

25

where, as here, the fleeing suspect has endangered others.  I therefore reluctantly concur in the result reached by the majority.